UNITED STATES CASUALTY COM-
PANY, Appellant,

v.

Elmer L. SCHLEIN, Appellee.

No. 20884.

United States Court of Appeals
Fifth Circuit.

Nov. 11, 1964.

Rehearing Denied Dec. 16, 1964.

Willard E. Dollahon, Hicks, Dollahon & Wohlt, Houston, Tex., for appellant.

Warner F. Brock, Bates & Brock, Houston, Tex., for appellee.

Before HUTCHESON, RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question in this Texas case is whether the District Court was right in holding that false testimony given but shortly retracted by the Assured did not constitute a prejudicial breach of the co-operation clause of an automobile liability policy. We hold the Court was correct and with slight modification affirm.

Indigenous to these many-cornered Donnybrooks, this controversy was waged on several fronts. It all grows out of a collision in Beaumont, Texas, on September 4, 1961, between the car owned and operated by Schlein, the Assured, and another occupied by the State Damage-suit Claimants.[1] On the suit being filed, the Assured, under instructions from the Insurer,[2] referred the matter to the Insurer's regular Defense Trial Counsel. The Insurer's adjuster, Villiva, made an investigation, although its nature, extent or sufficiency is wholly undisclosed by this record.

By appropriate maneuvers, Defense Trial Counsel forced the Damage Claimants by binding pleadings to spell out precisely how the accident occurred. In a nutshell, it was that the Damage Claimants' car was proceeding north on Kansas Avenue with the intention of proceeding east after making a right turn at the intersection of 16th Street. The Assured's car, proceeding west on 16th from the east, started making a right turn onto Kansas Avenue when, without prior warning, it made a complete U-turn in the intersection resulting in the right side of the Assured's car striking the left front side of that of the Damage Claimants'. In the course of preparation for trial, Defense Trial Counsel on January 22, 1962, took the pretrial oral depositions of the two Damage Claimants. Each substantially repeated this story. From questions put, there was also the suggestion that the Assured was not alone, that there was a Negro woman in the back seat of his car. Upon completion of these depositions, the counsel for the Damage Claimants proceeded to take the oral deposition of the Assured whose story was quite different. He testified he had spent the evening at the Country Club playing cards, but had had no intoxicating liquor and while traveling alone in an easterly direction on 16th Street, the Damage Claimants' car ran through the stop sign and struck the right rear of his Lincoln convertible.

Within a few days (fixed by the Judge at January 25, 1962), an associate attorney in the office of Defense Trial Counsel received a call from Alvin Diamond, personal attorney for the Assured. Diamond related that the Assured had told him (Diamond) that some of the testimony in his deposition was not true. Specifically, so Diamond related, the Assured had testified that he was not making a U-turn when in truth and in fact he was making a U-turn; that he had no one in his automobile with him at the time of the collision, when in truth and in fact he had as his passenger his colored maid, and that he had not been drinking, when in truth and in fact he had had a few drinks that day.

It is significant that at this point, and indeed up to the time when the Insurer's instruction requiring Defense Trial Counsel to withdraw from the case in June 1962, there is no indication whatsoever in the record that the Damage Claimants or their counsel had any idea or notion that the Assured had, in this roundabout fashion, recanted any part of his pretrial deposition.

1. The State damage suit was brought by Lanston Jacquet and Allen Parterie for personal injuries.

2. United States Casualty Company:

The Defense Trial Counsel did not immediately communicate this information obtained from Diamond to the Insurer. This was not, however, without reason—a reason which stands uncontradicted on this record. The partner responsible for the defense deliberately postponed report as he wanted to verify this information directly from the Assured's own mouth, not through an interlocutor, before reporting such serious charges to the client-Insurer. It was not until early June that efforts were successful in arranging for a confrontation of Defense Trial Counsel and the Assured which, as we later discuss, precipitated the Insurer's withdrawal from the case.

Meanwhile, Defense Counsel was neither silent nor inactive. On February 12, he sent a detailed report to the Insurer. Besides an outline of possible medical evidence bearing on the extent and nature of injury, it included a résumé of the pretrial depositions. It briefly summarized the factual information given by one Damage Claimant and corroborated by the other as to the movement of the two vehicles. This paralleled the version formally pleaded in their State Court complaint.

The report then proceeded to emphasize the "entirely different version of how the accident occurred" testified to by the Assured. It briefly summarized his testimony "that he had spent the evening at the * * * country club, playing gin rummy * * *. * * * that he was alone, * * * had no intoxicants to drink at the country club and was traveling in an easterly direction on 16th Street * * * and * * * [the Damage Claimants' car] simply ran through the stop sign and struck the right rear of his Lincoln convertible." The letter plainly emphasized the disparity by urging that the Insurer should "note that according to [the Assured's] testimony he was traveling in a direction exactly opposite to that related by * * *" the Damage Claimants.

More important than this, the report then went on to point out the serious doubts of Defense Counsel as to the reliability of the Assured's sworn story. Thus, the letter continued, "Although [the Assured] denies that he had anything to drink, we are very apprehensive that [the Damage Claimants] may be able to establish that he had been drinking." Further, it went on, the Assured "in his testimony is often evasive, * * * is very confused about some of the details, * * * is unable to recall where or how he spent Labor Day afternoon, and * * * claims not to remember the names of any of the persons with whom he played gin rummy at the country club." Likewise, no punches were pulled as to the case of the vanishing passenger-potential witness. The report stated that the Damage Claimants "apparently claim that Theresa Powell, a maid in the employ of [the Assured's] household * * * was in the automobile * * * at the time of the accident. * * *." It pointed out that when she was contacted by Villiva, the Adjuster, she denied being in the car but refused to sign a statement to that effect. Additionally, the depositions revealed Theresa Powell to be a friend of the common law wife of one of the Damage Claimants. These factors led the Defense Counsel to the "opinion" that "the claimants' attorney in all probability has a written statement from Theresa Powell to [the] effect" that the maid was in fact a passenger.

The report concluded with something less than an optimistic outlook. Commenting on the confidence of the attorney for the Damage Claimants, it stated that he "has advised * * * that he is in position to prove by disinterested witnesses that our assured is entirely wrong about how this accident occurred." It requested additional investigation by the Adjuster Villiva and then, for good measure, again reflected doubt in the reliability of the Assured's version. It stated, "We intend to get [the Assured] in our office and have a very frank discussion with him regarding his condition at the time of the accident, whether Theresa Powell was with him in the car and other matters about which there is great

dispute between the versions given by [the Damage Claimants] on the one hand and [the Assured] on the other."

To this report, the Insurer's home office replied on February 21, 1962. Without any explanation there made— or for that matter anywhere else in the record—the opening line stated the report of February 12 "comes as a considerable shock." The Assistant Claims Manager suggested that the entire membership of the country club be gone "through * * * to turn up any persons who will be in the position to support our insured's story." It then suggested that the " * * * complete background, including any possible criminal record, * * * of both claimants must be uncovered to obtain any deflationary matter which may be available to us." With no indication there—or again, anywhere in the record—as to what a successful defense would be, the brief response concluded briefly, "In brief it will be necessary to pick this case up by its boot straps and shake it down in shape for a successful defense." This letter crossed one of the same date from Defense Counsel to the home office stating that as "soon as Mr. Villiva has completed the additional investigation we suggested in our letter of February 12th and after we have then conferred with [the Assured] * * * we will write you further."

It was not until early June that defense counsel was finally able to talk to the assured in person. Of this conference, Defense Counsel by letter of June 4, 1962, reported that "the results * * give us considerable concern." The report then briefly summarized the statements confirming essentially what Attorney Diamond had earlier stated. The Assured had had a few drinks, but was not intoxicated; had the Negro maid with him; and had made the U-turn as described by the Damage Claimants. Defense Counsel did not minimize the importance of this development. The report expressly recognized the embarrassing predicament, the exposure of the Assured in cross examination to the prior contrary sworn testimony, and the likelihood that this would antagonize the average juror thus causing the jury to convict the Assured of negligence with a liberal award of damages. Reporting the current $25,000 settlement demand and likelihood of some reduction, Defense Counsel requested advice suggesting the possibility of proceeding to trial in order to obtain the Claimants' lowest offer.

Eight days later, on June 12, 1962, the Insurer by telegram notified the Assured that it was "withdrawing from your defense" of the damage suits "because of your substantial material and prejudicial breach of cooperation clause * * *." On June 14, 1964, Defense Trial Counsel by formal motion sought and obtained leave to withdraw as counsel on the stated ground that the Insurer was withdrawing its defense of the Assured and had instructed Trial Counsel to withdraw. This put the defense back on the Assured. It was conducted for him by Attorney Alvin Diamond who, within a few months, consummated a settlement for $10,000 on September 17, 1962. It was formally stipulated that this settlement was fair, reasonable and prudent.

Thereafter, the Assured brought the instant case in the Federal Court against the Insurer seeking a declaration and a money award for the amount of the settlement together with attorney's fees in the defense of the case and attorney's fees in the prosecution of the declaratory judgment action. The District Judge held for the Assured, made the suitable declarations, awarded reimbursement of the amount paid in settlement, together with attorney's fees for the defense, and further attorney's fees for the prosecution of the declaratory judgment suit (plus an additional allowance for this appeal which was then contingent only).

In arriving at this declaratory judgment, the Court found that the misstatements in the depositions, retracted prior to any trial, "did not constitute a substantial and material breach of the cooperation clause" and further that the Insurer did "not suffer prejudice from such

misstatements." It arrived at no express conclusion on the alternative contention of the Assured which is pressed again here that since Defense Trial Counsel, after the report from Attorney Diamond, had full and immediate knowledge, there was either a waiver of any asserted breach or the Insurer was estopped to assert it. We likewise find it unnecessary to pass on that alternative ground.

■ We can accept the proposition that the law generally, and presumably does so in Texas, regards purposeful falsification of material information by the assured to be a breach of the cooperation clause of the type here involved.[3] Truthfulness as an element of cooperation has been variously described. "Truthfulness seems to be the keystone of the cooperation arch." Home Indem. Co. of New York v. Standard Acc. Ins. Co. of Detroit, 9 Cir., 1948 (Cal.), 167 F.2d 919, 924. "The company is entitled, however, to an honest statement by the insured of the pertinent circumstances surrounding the accident, as he remembers them. Lacking that, the company is deprived of the opportunity to negotiate a settlement, or to defend upon the solid ground of fact. Nothing is more dangerous than a client who deliberately falsifies the facts." Buffalo v. United States Fid. & Guar. Co., 10 Cir., 1936 (Okl.), 84 F.2d 883, 885. And writing there for Georgia, we had this to say in Hall v. Preferred Risk Acc. Ins. Co. of New York, 5 Cir., 1953 (Georgia), 204 F.2d 844, 848, 140 A.L.R.2d 162. " * * [t]he insurer was entitled to the complete truth concerning the circumstances surrounding the accident. * * * In Buffalo v. United States Fidelity & Guaranty Co., 10 Cir., 84 F.2d 883, 885, it was held that an insurance company is entitled to an honest statement by the insured, lacking which the company is deprived of the opportunity either to negotiate a settlement or to defend upon solid ground." Like expressions and holdings are found in numerous cases, see Ocean Acc. & Guar. Corp. v. Southwestern Bell Tel. Co., 8 Cir., 1939 (Mo.), 100 F.2d 441, 122 A.L.R. 133; Coleman v. New Amsterdam Cas. Co., 247 N.Y. 271, 160 N.E. 367, 72 A.L.R. 1443; Williams v. Employers Mut. Liab. Ins. Co., 5 Cir., 1942 (Ala.), 131 F.2d 601; Tillman v. Great American Indem. Co. of New York, 7 Cir., 1953 (Wis.), 207 F.2d 588, 592; United States Fid. & Guar. Co. v. Wyer, 10 Cir., 1932 (Okl.), 60 F.2d 856, 858; Great Am. Ins. Co. of New York v. Dennis, D.C.N.Y., 1962 (Ky.), 203 F.Supp. 482, 487.

Of course this sort of breach of cooperation comes from conscious, purposeful falsification. The idea must be applied with caution lest misstatements based on faulty observation, recollection, actual but genuine mistakes, or the like become the instrument by which the Insurer could escape its obligations of defense and payment at the first sign of any disparity in the versions of the various witnesses. But when confined to purposeful falsity as to material and significant facts, the rule is a common sense application of the basic requirement of good faith dealings by an assured toward his insurer. Chaachou v. American Central Ins. Co., 5 Cir., 1957, 241 F.2d 889, 892–893. This has particular importance in liability insurance policies in which the insurer is subject to heavy and awesome obligations to defend either in good faith or with prudence,* as the local law requires, even though there might not be any ultimate obligation to make payment. See Burton v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1964, 335 F.2d 317; American Fid. & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., 5 Cir., 1960, 280 F.2d 453.

---

3. The policy in suit provided:

"5. **Assistance and cooperation of the Insured—Parts I and III:** The insured shall cooperate with the company and, upon the company's request, attend hearings and trials and assist in making settlements, securing the giving evidence, obtaining the attendance of witnesses and in the conduct of any legal proceedings in connection with the subject matter of this insurance * * *."

■■ On this approach, and were the Trial Judge's findings [4] standing alone, we might well question the correctness of the conclusion that these false statements did not constitute a breach of the cooperation clause. But the findings do not stand alone and, more important, the Texas law by which we are *Erie*-bound requires something more than just the false material statements. Texas imposes on the insurer claiming a breach the burden of establishing that the false material statements prejudiced the insurer. Griffin v. Fidelity & Cas. Co. of New York, 5 Cir., 1960 (Texas), 273 F.2d 45, 48.[5] On this the trial Judge made a categorical finding of no prejudice.[6]

There was ample basis for this finding which was both adverse to the Insurer and one on which it had the burden of proof. Only a few factors need be mentioned.

Actually no proof on the point, as such, was offered. The Insurer seemed content to rely on the general proposition that with the Assured having falsely sworn one way in an earlier formal pretrial deposition, his credibility would be subject to serious attack when the case were tried if, as was then certain, he were to testify truthfully. This is self-evident if—and the if is a big one—it had been determined that the case was to be tried. But this record is barren of any judgment either tentative or final, on the part of the responsible claims management of the Insurer as to what they intended to do with this case. If the Insurer had any notion of a defense to the case, no one has suggested what it might be.[7] The record does show that for the federal declaratory suit, the Assured took the pretrial deposition of Villiva, the Adjuster, but no one offered any portion of it. What it revealed concerning his further investigation on the matters discussed in the important report of February 12, is a complete unknown. For all we know his further investigation merely bore out what Defense Trial Counsel's report made quite plain—that the Assured's version was incorrect, would be disbelieved, and could not be substantiated by credible evidence. It is evident from the immediate response from the Assistant Claims Manager expressing "shock" that the Insurer realized that this was a case of much greater seriousness than first thought. Indeed, the successful tactic for defense then suggested was not to bolster the Assured's version, but to attack the moral quality of the opposition through the hope of uncovering an unsavory or criminal record on the part of the Damage Claimants.

■ And as is so often the case, the test of the pudding was in its eating. The case was not tried, nor is there any indication that it ever would have been. Despite the fact that the action of the Insurer in withdrawing and instructing Defense Trial Counsel to do likewise revealed the schism between the Insurer

---

4. Finding of Fact 21: "I find that the misstatements made by the [Assured] * * * which were corrected prior to trial and within a few days after the [Assured] gave his deposition * * * did not constitute a substantial and material breach of the cooperation clause * * *."

5. As to some other policy conditions, Texas does not require proof of prejudice, Klein v. Century Lloyds, 1955, 154 Tex. 160, 275 S.W.2d 95; National Sur. Corp. v. Wells, 5 Cir., 1961 (Texas), 287 F. 2d 102, 105 (notice of the occurrence and notice of suit).

6. Finding Fact 22: "I further find that the [Insurer] did not suffer prejudice from such misstatements by the [Assured]."

7. This is in no sense a backhanded application of the proposition everywhere rejected that false statements are lacking in prejudicial effect if the false story is ostensibly more "favorable" than the truth (e.g., the Assured's first swearing that he had had nothing to drink was more favorable than the truth that he had a few drinks). See Tillman v. Great Amer. Indem. Co. of New York, 7 Cir., 1953 (Wis.), 207 F.2d 588, 592; Home Indem. Co. of New York v. Standard Acc. Ins. Co., 9 Cir., 1948 (Cal.), 167 F.2d 919, 927.

and Assured, personal counsel to the Assured proceeded in the next three months to work out an amicable settlement of $10,000 which is acknowledged to be fair and reasonable.[8] There is thus no indication whatsoever that the obvious forewarning from the report of February 12, the confirmation of the Assured's recantation of false testimony in the subsequent report of June 4, put the Insurer in a predicament of being unable to work out that disposition of the case which its own intrinsic merits—then sufficiently known—reasonably dictated. On the contrary, there was ample basis for the Court concluding inferentially that what the private counsel did after disclosure of the internecine conflict, the Insurer could have done itself. All it had to do was continue in the defense including good faith settlement negotiations, instead of publically abandoning the Assured on the eve of an imminent trial.

■■ With an entire absence of any record evidence on the point,[9] the Insurer fails completely in its heavy burden of demonstrating to us that this finding of no prejudice (note 6, supra) is clearly erroneous. F.R.Civ.P. 52(a). Without this finding, the defense of breach of cooperation fails. As this was the sole basis for the assertion of nonliability, it follows that the judgment declaring rights in favor of the Assured was correct.

■■ Only a tag end remains. The Insurer challenges the award of attorney's fees and costs incurred by the Assured in the defense and settlement of the damage suit. Of course, these expenditures are the direct result of the impermissible abandonment of the Insurer's duty to defend and are therefore recoverable as a part of the Assured's damages. The amount was adequately established by competent evidence. But we sustain the Insurer's attack on the allowance of attorney's fees for the prosecution (and appeal) of this federal declaratory judgment suit. The Assured concedes that recovery cannot be based on art. 3.62 (1963) of the Insurance Code, Vernon's Tex.Civ.Stat.Ann. Travelers Indem. Co. v. Holman, 5 Cir., 1964, 330 F.2d 142. And under the circumstances of this case, we do not believe that this was one in which they should be awarded under the inherent ·equitable power of a Federal Court to award attorney's fees. Sprague v. Ticonic National Bank, 1939, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; cf. Vaughan v. Atkinson, 1962, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed. 2d 88, 1962 AMC 1131. The judgment must be modified accordingly.[10]

Modified and as modified affirmed.

8. This fact makes essentially irrelevant the affidavit testimony of the attorney for the Damage Claimants outlining how he planned to take full advantage of the Assured's credibility being destroyed had the case been tried. Actually, as permitted by an earlier order of the Court, these were filed long after its findings of fact, conclusions of law and judgment had been entered. Besides being a procedural practice warranting disapproval as an effort to remake a record after the act is done or the case closed, cf. Williams v. National Surety Co., 5 Cir., 1958, 257 F.2d 771, 777, the actual settlement, apparently made with ease, largely discounted these optimistic predictions as to what would have been done had the case been tried.

9. Actually the case was submitted without any evidence save specific portions of the deposition of the lead Defense Trial Counsel. The false statements, the recantation, etc. were covered by pleadings, admissions, and the pretrial order, etc.

10. This deletes the allowance of $2500 attorney's fee "for the bringing and maintaining of this action" in the Federal Court and the additional $1500 "fee for representing the plaintiff [Assured] on said appeal."