## KNOXVILLE BUSINESS COLLEGE

v.

## Dr. Ernest BOYER, United States Commissioner of Education.

### Civ. No. 3–77–428.

United States District Court,
E. D. Tennessee, N. D.

March 14, 1978.

Supplemental Memorandum
April 20, 1978.

---

Charles D. Susano, Jr., Knoxville, Tenn., for plaintiff.

Robert E. Simpson, Asst. U. S. Atty., Knoxville, Tenn., Steven J. Edelstein, Asst. Regional Atty., U. S. Dept. of HEW, Atlanta, Ga., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This action involves the administration of the Federal Insured Student Loan Program ["FISLP"] under Title IV, Part B, of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.* Plaintiff, Knoxville Business College ["the College"], is a privately owned vocational junior college of business located in Knoxville, Tennessee. On April 15, 1970, the College entered into a "Contract of Insurance" with the U. S. Commissioner of Education ["the Commissioner"] which provided that the Commissioner would insure (guarantee) all loans made to students by the College which were eligible for such insurance. (Ex. 10). Before the Court are loans made by the College to seven of its students in 1973 and 1974, which are now in default, and for which the College has filed claims to collect the amount of insurance granted on each loan.[1] In addition, the College seeks interest on thirty-four claims for which the Commissioner has admitted liability for the principal balance due. Finally, the Commissioner has counterclaimed for an unspecified amount of interest and "special allowance payments" which were allegedly erroneously paid to the College on unauthorized loans. This case was tried to the Court without a jury on March 10, 1978.

### Lending Limit

As developed by the evidence at trial, the procedures used by the College to obtain insurance on a student loan were fairly simple. A student desiring to obtain a federally insured loan to attend the College completed an application form provided by the Commissioner to the College. (Ex. 2). A college official helped the student with

---

1. The complaint initially involved some forty-three defaulted student loans. However, through an agreed partial summary judgment and dismissal of one claim, only seven loans remain at issue.

the form, approved the form and forwarded it to the Regional Office of the Office of Education in Atlanta. If the loan application was correctly completed and met the requirements for insurance, the Regional Office would stamp it in the upper right hand corner. The stamp reads across the top "FEDERALLY INSURED"; next it has a date; and, at the bottom it has a stamped signature of the Commissioner (or his designated officer). Below the stamp is a space for "Amount of Commitment", wherein an amount would be entered. The stamped application would then be returned to the College as notice that the loan had been insured on the date indicated on the stamp and for the amount entered beneath the stamp. When an application was incomplete or incorrect, it would be returned to the College with the mistaken entry underlined in red, so that the College could correct the error or withdraw the application.

Following this simple procedure, the College obtained federal insurance for student loans it made in 1970–72. In the early part of January 1973 the Commissioner sent a notice to all school lenders, including the College.[2] The notice advised the College that "the Division of Insured Loans— through Evaluation Committee action—is placing a lending ceiling on all school contracts *to be effective during the coming fiscal year of each school."* (emphasis added) (Ex. 3). The notice also warned the College that until it received notification of its ceiling figure it "would be well advised to exercise restraint in your use of the lending contract, inasmuch as *loans currently being made under your contract will count against the annual limitation when it is applied."* (emphasis added). The two emphasized portions appear to conflict on whether the ceiling figure was to be based on calendar year 1973 or upon the school's fiscal year. The College contends that it relied on the language referring to the "coming fiscal year" and assumed that any

limit would apply only to its coming fiscal year which would begin on September 1, 1973. Yet, in the same notice there is language advising the College to "exercise restraint . . . inasmuch as loans currently being made under your contract will count against the annual limitation." While this warning, alone, might not be sufficient to overcome the College's reliance argument, a later letter received by the College made it clear that the limit on lending would apply to calendar year 1973.

On January 12, 1973, an officer of the Division of Insured Loans sent a letter to A. M. Luther, Jr., the Executive Vice President of the College, informing him that:

"We are pleased to inform you that the [Evaluation] Committee has approved the continuation of your school's Contract of Insurance for the next 12 months. In doing this the Committee stipulates that *your school is not to exceed $150,000 in new loan commitments during 1973."* (emphasis added).

Upon receipt of this letter the College was clearly put on notice that it would not receive federal insurance on student loans made in 1973 once the aggregate amount of those loans exceeded $150,000.

What happened in 1973 is a comedy of errors and reveals a sad state of affairs on the part of the Office of Education. Following the above-discussed process of sending loan applications to Atlanta and having them stamped as insured, the College obtained "federal insurance" on student loans totaling $482,154 during 1973.[3] According to the testimony, neither the College nor the Regional Office attempted to keep a running total on the amount of the loans the Regional Office was approving as federally insured. The College argues that, when the stamp was placed on the applications, which exceeded $150,000, the Commissioner thereby extended the limit to cover that additional loan. It appears that the

---

2. The College admits receipt of the notice.

3. This figure is provided by the Commissioner on page 3 of his Memorandum in support of his

motion for summary judgment, filed February 10, 1978. The Commissioner did not have knowledge of this overextension until 1976 when he first had computer analysis available.

Commissioner, in order to properly enforce the lending limit imposed on institutions, should have maintained a system (which he now has in effect), whereby he could monitor the loans and reject any applications which exceeded an institution's lending limit. However, he chose to rely on the institution to do its own self-monitoring and to not submit applications for loans once the lending limit had been reached. The Court cannot hold that such action on the part of the Commissioner was arbitrary or unfair. The College admits it had notice of the limit and, in the opinion of the Court, that is sufficient to make such limitation binding on it.

The authority of the Commissioner to impose such limits is clear, *Windsor v. Secretary of Health, Education and Welfare,* 550 F.2d 1203 (9th Cir. 1977), and the Contract of Insurance provided that the Commissioner would insure all eligible loans "[w]ithin such limits as may be set by him. . . ." (Ex. 10).

The Commissioner has done a computer analysis of the College's 1973 loans and determined that the College reached its lending limit on April 5, 1973. The Court holds that loans made by the College during 1973 that were made after April 5th could not be insured because of the lending limit imposed on the College. Therefore, five of the seven claims asserted herein by the College against the Commissioner for the collection of insurance are simply invalid. Those five loans were made during 1973, after April 5, and consist of the Coleman, King, Parkey, Begley, and Hendricks loans (approximately $6,703.70 total principal balance).

### 1974 Loans

The remaining two claims are based on loans made in 1974, the Melton and Meads loans, totaling approximately $2,722.90 in principal balance. While there has been some dispute as to whether the $39,220 in loans approved in 1974 were authorized, the preponderance of the evidence demonstrated that the College was never notified to stop lending in 1974. The evidence also showed that no lending limit was placed on the College during 1974. One witness spoke of an Office of Education officer referring to "back door notice" of a limit, but the proof failed to show even informal notice. The Court holds that the two loans made by the College in 1974 were properly submitted to the Commissioner for insurance and that he did insure those loans. Therefore, the College's claim for insurance on the Melton and Meads loans is to be paid by the Commissioner.

### Interest on Insured Loans

As mentioned previously, the Commissioner denies that he owes interest on the thirty-four claims for insurance which he has admitted were valid, as well as the interest on any additional claims the Court might hold were valid. However, the Act requires that the "insurance liability on any loan insured by the Commissioner under this part shall be 100 per centum of the unpaid balance of the principal amount of the loan *plus interest.*" 20 U.S.C. § 1075(b). *See also* 20 U.S.C. § 1080(a). (emphasis added). The Commissioner shall pay any interest due on the thirty-four claims upon which liability was agreed to before trial, and the two claims for which the Court has held him liable herein.

### Counterclaim

The Commissioner's counterclaim must be dismissed for lack of proof showing the specific amounts involved and lack of proof demonstrating that such payments were even made.

### Conclusion

For the foregoing reasons, it is ORDERED that:

(1) the five claims for federal insurance on student loans made after April 5, 1973 but before January 1, 1974, are invalid because of the lending limit reasonably imposed upon the plaintiff;

(2) the two claims for federal insurance on student loans made in 1974 are valid and the Commissioner shall pay said claims;

(3) the Commissioner shall pay any interest due on the thirty-four claims he has admitted were valid, as well as any interest due on the additional two claims held valid by the Court; and

(4) the counterclaim of the Commissioner is dismissed for lack of proof.

Order Accordingly.

## SUPPLEMENTAL MEMORANDUM

This action was tried to the Court without a jury on March 10, 1978. The Court filed a Memorandum Opinion and Order on March 14, 1978 disposing of all issues in the case. On March 28, 1978, the defendant, Dr. Boyer, filed a motion for reconsideration of the Court's dismissal of his counterclaim, and plaintiff has filed its response to that motion.

The counterclaim at issue was set out by defendant in his answer filed on February 10, 1978 (at pp. 3–5). Asserting the common law doctrine that the United States may recoup funds erroneously paid, the defendant sought in his counterclaim to have the Court declare that he erroneously paid to plaintiff "interest and special allowance payments" on loans which he alleged were improperly insured under the Federal Insured Student Loan Program ["FISLP"], and, therefore, such payments should be recouped. In the previous Memorandum filed on March 14, the Court held that all loans made after April 5, 1973 and before January 1, 1974 were improperly insured and no liability of defendant could be based thereon. The Court, however, dismissed defendant's counterclaim. The ground for dismissal was the lack of proof as to the amount of said payments and the lack of proof that such payments were made.

In his memorandum of law supporting the motion to reconsider, defendant admits that he did not present evidence at trial on the exact amount of those payments, but he asserts that because such information "was not readily available, the Regional Office of Education was unable to supply this figure." (Defendant's Mem. at 2). However, defendant also asserts that, in spite of the reference to the contrary in the Memorandum Opinion, uncontroverted evidence was placed before the Court demonstrating that such payments were, in fact, made to the plaintiff.

Plaintiff, in its response to the motion, quotes the Court's previous reference to the lack of proof on the issue of whether the payments were made. Furthermore, plaintiff argues that no amount of payments was proved, that the defendant has had ample time to ascertain the amount of such payments, that the pretrial order contemplated proof on the amount due, and that it would be unfair to declare liability without determining the amount due.

At the time the Memorandum Opinion was rendered, the Court did not have access to a transcript of the trial proceedings and relied only on its notes and recollection as to the testimony. Furthermore, the testimony was confusing at times, in spite of the Court's attempts to get the lawyers to present the evidence in a concise and understandable manner. Upon consideration of the instant motion, the Court has instructed the Court Reporter to provide it with the record of Mr. Tamsey's testimony.

Mr. Tamsey testified that "interest subsidy" and "special allowance payments" were made to Knoxville Business College, the plaintiff. Having studied this testimony, the memoranda of law, and the case file, the Court is convinced that a declaration in favor of defendant on his counterclaim should have been entered, but such judgment should apply only to loans made after April 5, 1973 and before January 1, 1974.

For the foregoing reasons, it is ORDERED that the previous Memorandum and Order entered in this action on March 14, 1978 be, and the same hereby are, modified so as to enter declaratory judgment for the defendant on his counterclaim but such declaratory judgment shall apply only to those loans previously held improperly insured, i. e., loans made after April 5, 1973 and before January 1, 1974.

Order Accordingly.