**AMERICAN SAVINGS, Plaintiff,**

v.

**Terrel H. BELL, Defendant.**

**Civ. A. No. 79–1834.**

United States District Court, District of Columbia.

Dec. 17, 1981.

Timothy D. Naegele, Naegele & Sanders, Washington, D.C., for plaintiff.

Rita S. Geier, Dept. of Justice, Civil Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., Chief Judge.

Citizens Savings (Citizens) [1] initiated this action to obtain the payment of over $600,-000 in insurance claims on 441 loans allegedly insured under the Federal Insured

---

1. Pursuant to a merger, American Savings is the surviving corporate entity. For purposes of simplicity, the Court will refer to the plaintiff throughout this opinion by the name it used prior to and during most of this litigation.

Student Loan Program (FISLP).[2] Citizens contends that the defendant breached its contract of insurance entered into with Bank of California (BOC) and Beverly Hills National Bank (BHNB) under which Citizens claims rights as assignee of the loans. Before the Court at this time are plaintiff's and defendant's cross-motions for summary judgment. The Court finds that Citizens failed to comply with the FISLP regulations which require satisfaction as a precondition to insurance coverage and therefore deny in full plaintiff's motion for summary judgment. Because certain factual issues remain unresolved at this time, the government's motion is partially granted and partially denied.

## I.

### BACKGROUND

BOC and BHNB, both eligible lenders under the FISLP, processed 214 and 248 FISLP loan applications, respectively, between March and June, 1973, for loans which were to be made to students of the Institute of Continuing Education (ICE).[3] These completed loan applications were submitted to the Office of Education (OE) during this time period to obtain insurance commitments thereon. OE reviewed and approved each of the loan applications, designating such approval by affixing to each application OE's stamp of insurance. This approval process was complete by June 31, 1973.

The facts leading up to the loan purchase transaction are in considerable dispute. The parties disagree on the nature of the relationship between ICE and BHNB, and the arrangement and execution of Citizen's purchase transaction. For this reason, the Court declines to grant the government summary judgment with respect to its entire counterclaim.[4] Throughout the remainder of the opinion the Court will assume, *solely* for the sake of the remaining analysis, that the loan purchase was executed in accordance with FISLP regulations.

On July 13, 1973, a purchase agreement was executed between Citizens and the two banks with respect to the loans at issue in this litigation. On the same date, Citizens enlisted the services of Academic Services Plan (ASP), a company which services and does collection work for federally insured student loans.[5] When Citizens purchased the loans, business had been going poorly at ICE for some time and by the end of 1973, things were rapidly deteriorating. On January 8, 1974, ICE lost its accreditation (and hence its eligibility to participate in the FISLP) and essentially ceased to operate.[6] Charles Heller, the Assistant Vice-President of Citizens who conducted much of the purchase transaction, became aware of ICE's closing in October, 1974 and traveled from bank headquarters in Illinois to California in November to visit ASP and determine

**2.** Up to the time of this suit, FISLP was administered by the Office of Education of the Department of Health, Education and Welfare. Pursuant to Public Law No. 96–88 the FISLP is now administered by the Department of Education. All references herein to the Commissioner of Education (Commissioner) and OE refer to the Secretary of Education and DE as well.

Unless otherwise indicated, all references herein to the FISLP Act are to the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071 *et seq.,* and all references to the FISLP regulations are to 45 C.F.R. § 177 *et seq.* (1973).

**3.** ICE was a correspondence school located in Los Angeles, California. In 1973 ICE was an eligible institution as defined under FISLP regulations thus enabling its students to apply for federally insured student loans pursuant to the Act.

**4.** OE has counterclaimed for all interest and special allowance payments made on the loans and for the return of 21 defaulted claims "erroneously" paid.

**5.** ASP was a California based collection company. It went out of business late in 1974, and Citizens hired National Student Loan Services, Inc., in January, 1975 to replace it. The two agencies were operated by the same individual, and all ASP collection activity referred to herein includes both ASP and NSLS.

**6.** At this time, each student of ICE holding federally insured student loans entered the nine month grace period. *See,* Lender's Manual, VII(A)(3). Thus, the duty to begin repayment commenced in October, 1974.

the status of its collection activities. Due to certain confusion regarding the precise closing date of ICE, no collection activities on Citizens' ICE loans had yet started.

Collection activity belatedly commenced in June, 1975 and continued throughout the following two months until final delinquency notices were sent to students at the end of July, with final demand letters following thereafter in early September. In July, 1975, OE placed a "hold" on all claims originating with ICE students until it could complete an investigation of the school's activities. Also in July, Citizens was granted a "Program Review" whereby OE's regional office in Chicago examined Citizens' FISLP activities to determine if they were in conformity with FISLP regulations. This brief review stated that possibly serious irregularities existed in the original purchase transaction, but otherwise indicated that Citizens was operating in an appropriate fashion. Citizens submitted a few claims for payment in January, 1976, but did not submit the vast bulk of claims until after March 12, 1976.

Citizens' claims remained on hold (although other lenders' claims were released) until OE could conduct a full investigation into the apparent problems with the purchase transaction. In April, 1979, the completed investigation concluded that the acquired loans were uninsured because they had not been properly disbursed prior to transfer and in addition that their acquisition was illegally induced in violation of 45 C.F.R. § 177.6(e).[7] On May 31, 1979, OE officials met with Citizens' president and attorneys to discuss the findings of the investigation. Two weeks later, OE issued its final determination denying payment of the claims, and shortly thereafter, Citizens filed this lawsuit.

**7.** 45 C.F.R. § 177.6(e) provides:
(1) No points, premiums or additional interest of any kind may be paid to any eligible lender in order to secure funds for making loans or to induce such a lender to make loans to the students of a particular institution or any particular category of students....

**8.** 45 C.F.R. § 177.48(a) provides, in pertinent part:

II.

## THE ADDITIONAL DEFENSES

When OE ultimately denied plaintiff's claim for reimbursement under the FISLP, it stated essentially two reasons for such denial: (1) the banks from which plaintiff purchased these loans had not properly disbursed the loans prior to their transfer to plaintiff and (2) the purchase of the loans was illegally induced in violation of 45 C.F.R. § 177.6(e). Defendant has raised herein as an affirmative defense that plaintiff failed to exercise due diligence in collecting the loans in question, thus violating the express requirement of 45 C.F.R. § 177.48(a).[8] Plaintiff contends that the government is barred from raising any defenses now that were not raised at the time of the initial denial. This contention is based upon "settled principles of administrative law" as well as the contract theory of equitable estoppel.

A. *This Court is Not Limited to the Agency Record in a Breach of Contract Action.*

█ Plaintiff seeks relief under two separate theories. The first is a breach of contract action wherein money damages are sought, and the second is to have the agency action set aside as arbitrary and capricious. If plaintiff was seeking only judicial review of OE's decision, it is absolutely clear that this Court would evaluate that decision based exclusively on the grounds that were initially provided by the agency for the denial of insurance benefits. In *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court

The Commissioner will honor claims for reimbursement for loss on a loan insured pursuant to this subpart only if: ... (2) the lender has used due diligence in attempting to effect collection of a defaulted loan; (3) a written demand for payment has been made on the borrower and on any endorser on a defaulted note not less than 30 days, nor more than 60 days prior to the filing of the claim for loss....

reviewed the denial by the Comptroller of the Currency to issue a bank charter and concluded that:

> the validity of the Comptroller's decision [to deny the charter] must stand or fall on the propriety of [the findings provided in the denial letter], judged, of course, by the appropriate standard of review.

*Id.* at 143, 93 S.Ct. at 1244.

The gravamen of this case however is not review of the agency's decision to deny insurance benefits to Citizens. It is instead a breach of contract claim, one under which plaintiff seeks to obtain over $600,000 in insurance benefits allegedly due it under the FISLP. And, notwithstanding the clear authority which limits a court's review to the agency record when agency action itself is under scrutiny, plaintiff has offered no support for the proposition that this Court should be equally bound in a situation where the agency is sued on a contract claim. Thus, the rules which constrict a court in its review of agency action qua agency action do not apply here. This Court has *de novo* review of the breach of contract count, and plaintiff's arguments to the contrary are without merit.

B. *The Government is not Estopped From Raising Defenses Which Were Not Included in the Denial Letter.*

Plaintiff alternatively contends that the government should be estopped on equitable grounds from asserting defenses which were not raised in the denial letter. In limited circumstances, the government may be subject to the rules of estoppel. However, this case is not one which can be included in this narrow category.

In the landmark case of *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Supreme Court set forth the general rule regarding the assertion of estoppel against the government, holding that the government may not be estopped by the acts of its agents when it is acting in a sovereign capacity. This general proposition has been subject to attack in recent years (most notably from the Ninth Circuit Court of Appeals), and some doubt has been expressed as to whether the distinction between a government's sovereign activity and its proprietary actions for purposes of estoppel remains viable. In *Molton, Allen & Williams v. Harris,* 613 F.2d 1176 (D.C.Cir. 1980), the Court placed heavy emphasis on whether the government agent had authority to act as he did and virtually ignored the issue of the nature of the government's conduct. However, the Court did determine that the government had entered "the domain of commerce" and was thus subject "to the same principles of justice that govern private parties." 613 F.2d at 1179. Therefore, the latest word by our Court of Appeals on this issue, still (at least impliedly) retains the sovereign/proprietary distinction.[9]

Thus, the question becomes in which category does the administration of the FISLP lie? At least one court has addressed this issue and has concluded:

> [c]onsidering both the huge sums of money set aside under the Higher Education Act to insure student loans and the clearly stated public purpose for the same, [the government is] acting in its sovereign capacity to provide a public benefit.

*Hicks v. Califano,* 450 F.Supp. 278, 283–284 (N.D.Ga.1977), *affirmed, Hicks v. Harris,* 606 F.2d 65 (5th Cir.1979). By so finding, the court held that as a matter of law, estoppel could not be asserted against the government in this context.

The Court concurs in the conclusion that the administration of the FISLP is a sover-

---

**9.** In *Hoeber v. District of Columbia Redevelopment Land Agency,* 483 F.Supp. 1356 (D.D.C. 1980), the court cited to the general demise of the Federal Crop Insurance Corp. holding, and without discussing the sovereign/proprietary distinction, held that the government agency which administered the redevelopment plan in question was estopped from changing the elements of the plan to the detriment of the parties involved. In *Hoeber,* although the agency was apparently acting in a sovereign capacity, the case for estoppel was quite compelling since the agency was attempting to alter settled rules which the parties had relied on in entering into the redevelopment project.

eign duty. In providing educational loan insurance, the government is conferring a benefit upon the public by satisfying a well recognized need to promote education under the Higher Education Act. The situation is indeed very similar to that which existed in *Federal Crop Insurance Corp., supra.* In that case, private insurance companies would not provide all-risk crop insurance of the kind offered by the government because it was too risky a commercial venture. In this case, the government promotes higher education by insuring loans that would otherwise be too risky for private lenders to offer. Thus, because the government is acting in a purely sovereign capacity in conducting the FISLP, estoppel may not be applied in this context.

Assuming arguendo that estoppel was applicable, the Court finds that the plaintiff has not made out a prima facie case in support thereof. In addition to satisfying the traditional elements of estoppel,[10] the theory may only be asserted against the government if the agent acting for the government was acting within the scope of his authority, an injustice has been perpetrated upon the party seeking the estoppel and when the public interest is not harmed by the application of estoppel in the particular context. Estoppel cannot rest on general notions of unfairness, but instead requires full satisfaction of all of the technical requirements.

First, there must be a false representation made by a government agent acting within the scope of his authority. The Court recognizes that the false representation may consist of mere silence when the

party seeking to be estopped has a duty to speak, yet fails to see how the nonassertion of the due diligence defects when the initial denial was issued amounts to a "false representation" which can be the basis of an estoppel argument. In fact, the Lenders Manual makes it quite clear that the due diligence requirement may be asserted even *after* the loans have been paid by OE if it is subsequently determined that such requirements were not met. Lenders Manual, IV(B)(6)(a)(1). Thus, the failure to raise due diligence problems can never amount to an affirmative waiver which precludes such assertion at a later time when these defects are discovered.

Another essential element of estoppel is that the asserting party be ignorant of the truth of the matter invoked. Plaintiff argues that the government should be barred from enforcing the statutorily mandated due diligence standard, yet it knew at all relevant times what that standard required of it.[11] The responsibility for determining what conduct is required to satisfy FISLP due diligence lay with Congress, and silence on the part of an agency official should not be considered a waiver of these requirements.

The party to be estopped must also have acted in a way that should have reasonably been expected to induce conduct by the other party to the other party's detriment. In this case, OE reviewed Citizens' claims and found that the purchase transaction itself was seriously flawed. In so finding, it never had to reach the issue of diligence in the collection process. It is not clear how the government "intended or expected" Citizens to react to the denial of benefits on

---

10. These elements are: (1) a false representation, (2) with a purpose to invite action by the one to whom the representation was made, (3) ignorance of the true facts by the party asserting estoppel and (4) reliance on the falsity to that party's detriment. *Hoeber v. D.C. Redevelopment Land Agency,* 483 F.Supp. at 1365.

11. The instant case can be analogized to *Knoxville Business College v. Boyer,* 451 F.Supp. 58 (E.D.Tenn.1978). There the Commissioner explicitly limited the schools lending capacity to $150,000 yet inadvertently authorized (stamped insured) over $400,000 in loans. When some of

these "excess loans" defaulted, OE denied benefits due to the original limitation placed on the schools lending capacity. The Court held that OE had not waived its right to enforce the lending limitation even though it had stamped as insured the excess loans. The school knew that the limitation had been imposed, and OE had properly relied on the schools accounting system as a check against possible over-extension of loans. Plaintiff's claims were denied, and OE's counterclaim for the recovery of interest payments on the unauthorized loans was granted.

these grounds. Plaintiff claims that it did rely to its detriment because had the denial been based on diligence issues, it would have had the opportunity to cure these inadequacies.

In certain circumstances, Regional Directors have discretionary power to permit a lender to cure defects in the collection efforts. However, OE will presumably authorize any cure only when the other statutory requirements have been satisfied; otherwise, it would be a meaningless exercise. Because Citizens' claims were denied on grounds which were separate and distinct from the diligence problems, the opportunity to cure diligence defects could never have arisen in the first place. Finally, plaintiff has not adequately demonstrated that it has suffered a "grave injustice" as a result of OE's failure to assert the due diligence defects at the initial denial stage. For all of the foregoing reasons, Citizens' estoppel argument is rejected.

### III.

### THE DUE DILIGENCE ISSUE

Defendant contends that Citizens did not exercise adequate due diligence at any stage of the collection process, including the choosing of the collection agency, the collection efforts themselves and the subsequent filing of the claims with the government. With regard to the choosing of the collection agency, the relevant question is not how or why Citizens chose ASP but instead whether ASP adequately performed the collection procedures required by OE.

### A. *The Collection Process.*

The regulations do not detail specific collection procedures but instead provide that a "lender shall utilize collection practices no less extensive and forceful than those generally in force among financial institutions." 45 C.F.R. § 177.48(b). Plaintiff has submitted to this Court its due diligence files. These files indicate that ASP con-

ducted fairly extensive collection efforts (once these efforts finally began) which included sending notices to delinquent students at ten (10) day intervals, contacting student references or using drivers license records to locate students who had "skipped", sending collection letters from counsel and demand letters by certified mail.

▮ The most serious flaw in Citizens' collection efforts is its failure to initiate these efforts until long after the required deadline. According to FISLP regulations, the grace period for ICE students expired on October 8, 1974 and thus the repayment period commenced. Delinquency notices should have been sent when the October and November payments were missing, but the first notices were not sent until June, 1975, *eight months later*. Timely issuance of delinquency notices is especially important when the defaulting students are associated with a correspondence school and spread over a wide geographical area. In *American Bank of San Antonio v. United States,* 633 F.2d 543 (Ct.Cl.1980) the Court noted that:

> [t]he obligation of prompt pursuit of payment by lenders ensures that lenders do not take advantage of the availability of loan insurance and leave to the government the collection efforts that it would normally make.

633 F.2d at 549. The record makes clear that Citizens did not satisfy its "obligation of prompt pursuit."

▮ Citizens attempts to attribute its late start to the fact that it was unaware of ICE's closing date and thus did not know when to start the collection efforts. However, Citizens' failure to conclusively determine the date that ICE closed until over a year after the fact further illustrates its haphazard record-keeping procedures and general lack of diligence. Citizens has the responsibility to monitor the eligibility status of the schools it does business with.[12] Plaintiff's assertion that it

---

12. The Lenders Manual requires lenders to "[u]tilize student status information on Loan Transaction Statements and information from the student and the school to keep a record of the students' address *and school status."* (emphasis added).

was OE's responsibility to inform it of ICE's status is both unfounded in the regulations and contrary to promoting efficient operation of the FISLP.

During the collection period, ASP sent a letter to several ICE students which effectively discouraged students from paying their loan obligations. Pertinent portions of this letter read:

> We will retain all of your correspondence in file and when your account is 120 days past due, a claim will be filed with the Department of Health, Education and Welfare . . . .
>
> During this period, you will receive past due billings and Mail-O-Grams from the United States Government. *Do not become alarmed at the receipt of the past due billing, for it is required by HEW to follow this entire procedure for the purpose of filing a claim to the Government for payment of this loan under the Federally Insured Clause.* (emphasis added)

Despite plaintiff's suggestion to the contrary, this letter has no effect other than to dissuade students from paying their loans, since it makes all the notices that the student receives appear as mere formalisms in the ultimate pursuit of collection from the federal government. Plaintiff contends (1) that the overall tone of this letter was not to discourage payment but was rather to solicit information from the student which would be helpful in processing the loans, and (2) the letter was sent to no more than 15% of the students in question. The former argument is rebutted by the clear language of the above cited paragraphs. The latter proposition (a conclusion reached by Citizens' Vice President Charles Heller) is based on information contained in the claim files, yet the record indicates that these files do not contain records of all of the correspondence sent by ASP to the students. Thus, it cannot be accurately determined from the claim files how many students in fact received this letter.

In short, once Citizens' collection efforts finally got underway, they were relatively consistent and generally fulfilled the requirements in the regulations. However, the significant delay in the commencement of these efforts coupled with the damaging effects of the "deterring letter" seriously prejudiced the possibility of recovery at all. Other problems with Citizens' diligence efforts, including haphazard record-keeping (evidenced by its failure to monitor the status of the school or the borrowers' repayment schedules) and the failure to include in the claim file all records of correspondence sent to the students (in violation of specific Lenders Manual requirements), denote the general lack of diligence on the part of both Citizens and its appointed servicing agent ASP.

### B. The Filing of the Claims.

 A bank that is participating in the FISLP is under an obligation to file defaulted claims with the agency in a timely manner. 45 C.F.R. § 177.48 specifies that:

> (a) The Commissioner will honor claims for reimbursement for loss on a loan insured pursuant to this subpart only if: . . . (3) a written demand letter for payment has been made on the borrower and any endorser on a defaulted note not less than 30 days nor more than 60 days prior to the filing of the claim for loss. . . .

The record herein conclusively establishes that Citizens did not submit one claim within the prescribed period, that 90% of the claims were submitted more than six months after the issuance of the demand letter, and that 25% of the claims were submitted *more than nine months* after the demand letter. We conclude that the failure to satisfy this procedural requirement is grounds for denial of insurance coverage.

 Citizens contends that a lender must only file claims within a "reasonable time" after the sending of the demand letter and after it is determined that the loans are uncollectable. Citing *American Bank of San Antonio v. United States,* 633 F.2d 543 (Ct.Cl.1980), Citizens alleges that the 60 day filing requirement is properly used as a "yardstick measurement" for determining what is reasonable. This claim is absolutely unfounded, and is specifically refuted by

the holding in *American Bank* and by the clear and unambiguous language of the statute. Far from relegating the filing requirement to a "yardstick measurement", the Court in *American Bank* concluded that the issue involved was whether the lender had made "a written demand for payment ... not less than 30 days nor more than 60 days prior to the filing of the loss." 633 F.2d at 549. Although the Court was uncertain as to whether a demand letter had never been sent or whether the time between the sending of the letter and the submission of the claim exceeded the 60 day limit, it held that "in either case, the plaintiff has not satisfied the requirements set out in section 177.48(a)(3) of the regulations." 633 F.2d at 549. The Court also specifically noted that "the two month period [is] *mandated* by the regulations, [and] it is not for participating lenders ... to decide whether it is necessary to comply with such *specific rules.*" (emphasis added)

The 60 day filing requirement is not a mere "yardstick measurement" for good reason. As the Court noted in *American Bank:*

> The requirement that the claim be submitted between 30 and 60 days following the final written demand for payment serves two purposes. First, it ensures that the students are given a reasonable opportunity to respond to the demand for payment before the government considers proceeding against them. Second, if the student nevertheless remains in default, the government has a reasonably fresh claim on which to pursue its right of subrogation.

633 F.2d at 549. The only method by which the government can hope to recover a portion of the massive amounts of student loans it guarantees is to be subrogated to a reasonably fresh claim. Indeed, the Lenders Manual specifies that "timeliness is the most important ingredient of collection activity." Thus, lenders are required to exer-

cise diligence in both collecting the loans and in filing the claims. Citizens has satisfied neither requirement. By submitting stale claims to the government (90% of the claims were filed *over two years* after the closing of ICE), Citizens has violated the express requirements of the statute thereby prejudicing any hope of recovery the government might otherwise have had.

Included in Citizens' contract of insurance with the government is its duty to satisfy the terms of the regulations. That Citizens did not comply with the filing deadline is not disputed by the parties. The effect of the noncompliance is, however, heavily disputed, and in fact differs from jurisdiction to jurisdiction. In some jurisdictions, an insurer may avoid liability under the policy only if it affirmatively demonstrates that it suffered prejudice as a result of the insured's noncompliance.[13] In others, the failure to satisfy the condition is a breach of the insurance contract and thus relieves the insurer from performance thereunder regardless of any prejudice suffered by it.[14] Plaintiff argues that the former rule should be applied in this case.

Although the District of Columbia Circuit Court has not had occasion to address this issue recently, the cases seem to place this Circuit in the latter category. In *Waters v. American Automobile Insurance Co.,* 363 F.2d 684 (D.C.Cir.1966), the insurance contract in question required written notice of loss to be sent to the insurer "as soon as practicable." The contract also contained a forfeiture clause making full compliance with the terms and conditions of the policy a condition precedent to any action against the company. The Court held that the plaintiff had not satisfied the condition of notice, and that the law of the District of Columbia did not require a finding of prejudice to the insurer. The Court felt bound to give effect to the forfeiture clause, noting that "unambiguous provisions [regard-

---

13. *See, e.g., Atlantic Mutual Insurance Co. v. Cooney,* 303 F.2d 253 (9th Cir.1962), *Powell v. Home Indemnity Co.,* 343 F.2d 856 (8th Cir. 1965), *Gladstone v. Fireman's Fund Insurance Co.,* 536 F.2d 1403 (2d Cir.1976).

14. *See, e.g., U.S. Casualty Co. v. Schlein,* 338 F.2d 169 (5th Cir.1965), *Sohm v. U.S. Fidelity & Guaranty Co.,* 352 F.2d 65 (6th Cir.1965).

ing fulfillment of a condition to perform-ance] have been judicially expressly effec-tuated in this jurisdiction." 363 F.2d at 686. *See also, Ace Van & Storage Co. v. Liberty Mutual Insurance Co.*, 336 F.2d 925 (D.C.Cir.1964) (strict compliance with the terms of the contract is a condition prece-dent to any action against the insurer).

This Court concludes that the pro-visions in 45 C.F.R. § 177.48(a) must be regarded as the kind of forfeiture clause which, under *Waters*, should be strictly con-strued. The plain language of the statute and the undeniable importance to the government of expeditious filing of insur-ance claims belies any contrary interpreta-tion. To say that the Commissioner will only honor claims when four specific condi-tions have been satisfied means, conversely, that when the conditions have not been met, the claims will not be honored and no "action" will lie against the government. In *American Bank, supra,* the Court con-cluded:

> [I]n fulfillment of his responsibility to provide careful federal supervision over the loan insurance program, the Commis-sioner [is] entitled to establish ... rules [and] to make compliance with them a condition of loan insurance. The reasona-bleness of requiring such compliance is confirmed by the fact that the plaintiff is a bank and therefore accustomed to deal-ing on a daily basis with ... regulations at least as involved as those governing the federal student loan insurance pro-gram.

633 F.2d at 546.

Even assuming arguendo that prejudice to OE need be established, the long se-quence of Citizens' dilatory tactics in regard to its processing and collection of the loans as well as the late filing of the claims creates a presumption of prejudice which has not been (nor can it be) rebutted. Citi-zens asserts that OE prevented any possible recovery through its subrogated rights by its own action, to wit, the imposition of a hold on the processing of ICE claims in July, 1975. However, had Citizens initially began the loan collection efforts on time (in October 1974 when the actual grace period expired), the claims would have been filed with the government sometime in March, 1975, over *four months prior* to the effec-tive date of the stay. Citizens may not take advantage of its own lack of diligence by asserting that the July stay prohibited the government from pursuing its subrogat-ed rights.

## IV.

## THE GOVERNMENT'S COUNTERCLAIM

Defendant has counterclaimed to recover both interest and special allow-ance payments made on the entire Citizens loan package, and the 21 default claims that were submitted to and paid by OE. It is clear that OE is entitled to reimbursement of payments erroneously made by its agents. *American Bank, supra,* 633 F.2d at 553, *Knoxville Business College v. Boyer, supra,* n. 11, 451 F.Supp. at 62. Thus, OE may recover the 21 default claims paid be-cause the due diligence requirements were not met with respect to all of the loans.

However, because the Court is making no finding at this time as to the status of these loans when purchased, OE is not now enti-tled to recover the full amount of interest and special allowance payments made on the loans. OE is under a continuing obliga-tion to make these payments as long as the insured loans are outstanding and not in default. Any defects in Citizens' collection activity or filing procedures do not affect this obligation. If it is later determined that the loans were uninsured from their inception due to the alleged improprieties in the purchase transaction, then OE may re-cover all interest and special allowance pay-ments as well.

## CONCLUSION

In conclusion, the Court notes that OE has not acted in an entirely forthright man-ner with regard to Citizens' FISLP activi-ties, and though the government's legal rights have not been prejudiced thereby, we believe the FISLP can be administered in a

**14**

more expeditious fashion. However, the balance in this case conclusively strikes in favor of the Government since it must rigorously enforce the FISLP rules and regulations or lose all hope of ever controlling the increasing default rate on federally insured student loans. Citizens failed to conduct its FISLP affairs in accordance with the regulations applicable thereto, and thus was properly denied insurance coverage.

The plaintiff's motion for summary judgment is denied, and the defendant's motion for summary judgment is granted in full with respect to plaintiff's claims and in part with respect to the defendant's counterclaim.

An appropriate Order accompanies this Memorandum Opinion.

## ORDER

The above matter having come before the Court on plaintiff's and defendant's cross-motions for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, the Court having considered the motions and papers filed herein, and upon consideration of the Memorandum Opinion filed this date, it is by the Court this 17th day of December, 1981,

ORDERED, that plaintiff's motion for summary judgment with respect to all of plaintiff's claims be, and the same hereby is DENIED; and it is

FURTHER ORDERED, that defendant's motion for summary judgment with respect to all of plaintiff's claims be, and the same hereby is GRANTED; and it is

FURTHER ORDERED, that defendant's motion for summary judgment with respect to defendant's counterclaim be, and the same hereby is DENIED with respect to interest payments made through October 8, 1974 and all special allowance payments and GRANTED with respect to the twenty-one (21) default claims that were erroneously paid to plaintiff; and it is

FURTHER ORDERED, that defendant's and plaintiff's motions to strike certain affidavits be, and the same hereby are DENIED.