**K & R ENGINEERING COMPANY, INC.**

v.

**The UNITED STATES.**

No. 84–77.

United States Court of Claims.

Feb. 20, 1980.

Lawrence N. Weenick, Clayton, Mo., attorney of record for plaintiff.

Alan C. Brown, with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Alexander Younger and Gerald L. Schrader, Washington, D. C., Robert J. Muffler, Dept. of the Army, of counsel.

Andrew L. Granat, Clayton, Mo., attorney of record for Pioneer Bank and Trust Co., intervenor.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KUNZIG, Judge.

---

FRIEDMAN, Chief Judge:

The plaintiff in this action seeks to recover $132,000 in damages for the alleged breach of a contract terminated by the government for its convenience. The government has moved for summary judgment on (1) its affirmative defense that an unlawful arrangement between the plaintiff and one of the government's agents rendered the contract unenforceable against the government, and (2) its two counterclaims for the amounts the government previously paid under this and other contracts tainted by the same illegal arrangement.[1] We heard oral argument, in which the plaintiff did not participate. We find that there is no issue as to any material fact, and grant the government summary judgment both on the defense and on the counterclaims.

### I.

The sordid tale that led to this lawsuit began in 1972 when the plaintiff became interested in bidding on certain contracts let by the Army Corps of Engineers. It sought the assistance of Allen I. Swenson, then the Chief of the Plant Branch of the St. Louis District of the Corps, who had the principal administrative authority over such contracts in that region. The initial contact was made through a friend of Swenson, Earl D. Whitmore, Jr., who informed Swenson that he had friends, later identified as John C. Ray and Carl Jaycox, the owners, directors, and officers of the plaintiff, who were interested in obtaining such contracts. He told Swenson that if their company received some of this work, they would make it worth Swenson's while. Swenson thereafter assisted the plaintiff in obtaining and performing the three contracts involved in this case.[2]

In 1973, Swenson's office was assigned the administration of a contract for the rehabilitation of bulkheads at Lock and Dam No. 25 on the Mississippi River (the bulkhead 25 contract). With Swenson's help, the plaintiff bid on and received the contract for this work. Shortly thereafter, bids were sought on a contract for similar rehabilitative work at Lock and Dam No. 26 (the bulkhead 26 contract). The plaintiff also received this work, again with Swenson's assistance. Both of these projects were completed, and the plaintiff was paid in full.[3]

The third contract the plaintiff received with Swenson's aid was entered into in 1974 and was for the rehabilitation of two barges. In 1975, before work was completed under this contract, the government terminated the contract because of the plaintiff's unsatisfactory performance. At that time, the government had made partial payments to the plaintiff totalling $138,366.68. It is the termination of this contract and the government's continuing refusal to complete payments under it that prompted this suit.

The initial agreement between Swenson, Ray, Jaycox, and Whitmore had been that Swenson would receive 5 percent of the face value of any contract he helped the plaintiff procure.[4] Before the bulkhead 25 contract was completed, however, the arrangement was altered to give Swenson 25 percent of the profits under these contracts.

---

1. There are also an additional affirmative defense and three additional counterclaims, and the government styles its motion as one for partial summary judgment. The government stated at oral argument, however, that if this motion is granted, that would provide a full recovery, and that it would dismiss the remaining counterclaims.

2. On six to eight occasions between 1972 and 1975, Swenson also helped the plaintiff procure purchase orders, which are subject to less formal procurement procedures than larger contracts. He received only from $50 to $110 for his efforts with respect to each of these orders, and these orders are not here at issue.

3. The plaintiff received $98,017.45 under the bulkhead 25 contract and $49,252.50 under the bulkhead 26 contract.

4. Swenson's assistance in the procurement of the purchase orders, see note 2 supra, was always compensated under the 5 percent method.

(Whitmore under either system was to receive a share equal to Swenson's.) Swenson received a total of $15,581 as his share of the profits under the two bulkhead contracts; he received nothing from the barge contract, which was terminated before it yielded a profit.

Swenson provided various forms of assistance to the plaintiff in connection with the letting and performance of the contracts. With respect to the bulkhead 25 contract, he gave the plaintiff advance notice of the invitation for bids so that it could prepare its bid. He informed the plaintiff of the maximum amount the Corps would pay, so that its bid would be below that figure. In drafting the specifications, he set a short time for performance, which would have necessitated overtime costs. He told the plaintiff, however, that the deadline could be safely violated, enabling the plaintiff to bid lower than others by not including the overtime costs seemingly required for timely performance.

After the plaintiff was awarded the bulkhead 25 contract, Swenson was appointed Contracting Officer's Representative. He was therefore the Corps official with principal and direct responsibility for dealing with the plaintiff and supervising its work. After high water levels allegedly increased the plaintiff's costs, Swenson told Ray that it was possible to obtain additional money from the Corps. He then recommended to the Corps that it pay the plaintiff to cover these costs.

Swenson gave the work only perfunctory inspections, and, in fact, instructed the plaintiff on ways to reduce costs by cutting corners. He also allowed the plaintiff to use government employees and machinery without requiring an appropriate reduction of the contract price.[5]

The events surrounding the bulkhead 26 contract were similar. After it became apparent that this work was needed, Swenson advised the plaintiff to submit a bid on it. At the same time, he attempted (but failed) to have the new project treated as part of the bulkhead 25 contract.

Swenson again was responsible for writing the specifications and administering the contract. The plaintiff again was low bidder, and Swenson recommended awarding the contract to it. As with the bulkhead 25 contract, Swenson had government personnel and equipment supplied to the plaintiff. He used a short completion date, and told the plaintiff that it would be able to exceed this date as it could the one in the bulkhead 25 contract. He failed to inspect the work adequately, although he admitted he had strong suspicions that the plaintiff was cutting corners. He permitted the plaintiff to disregard a contract specification, which resulted in an easier job for the plaintiff but incomplete painting of some difficult-to-reach areas, without reducing the contract price.

Swenson once again provided substantial assistance to the plaintiff with respect to the barge contract. The plaintiff's bid, again the lowest, was approved by Swenson, who recommended awarding the contract to the plaintiff even though the plaintiff had never before attempted a project of this scope and Swenson himself had doubts about its ability to perform adequately.

As with the two bulkhead contracts, Swenson and the plaintiff discussed ways of cutting corners on the contract, and Swenson procured contract modifications beneficial to the plaintiff. Swenson permitted the plaintiff to spray paint over wet surfaces although he knew that the practice

---

**5.** The plaintiff disputes the allegation of wrongdoing in connection with these acts. It claims, for example, that "[a]nyone familiar with government contracting procedures knows that most of the inspecting of the work is left to the contractor and any failure to meet the specifications is done at his own risk." It also urges that there was nothing improper about the specific example of cost-cutting cited by the government—the use of three coats of paint rather than five—because the contract did not require five coats of paint if the desired thickness could be reached with fewer. Finally, the plaintiff claims that the government provided the machinery and personnel in exchange for the plaintiff's agreement to move the worksite to a place other than that specified in the contract. But even under plaintiff's view of these facts, summary judgment still would be appropriate. *See* section III *infra*.

was unsatisfactory. When the plaintiff had trouble in performing the work specified in the contract, Swenson suggested that it could claim additional funds and time for performance by alleging defective specifications and practical impossibility. Swenson personally drafted the letter to the Corps signed by Ray that made such claims.

The scheme started to fall apart because the plaintiff was unable satisfactorily to complete the barge contract. Ray notified the Corps by letter on December 1, 1974, that the plaintiff was ceasing work on the barges at the direction of Swenson. He stated that the owner of the barges, Army Troop Support Command, "fends [sic] my work 100% totally uncceptable [sic]," but that "Mr. Swenson has never before found difficulties with the exterior work and we were never notified that there were any defects in that work."

Swenson resigned from the Corps on February 27, 1975, after discovery that he owned 25 percent of Pilot Services, Inc., a company which had done work for the Corps under contracts for which Swenson was responsible. Although the remaining shares of Pilot were held equally by Ray, Jaycox, and Whitmore, the connection between the plaintiff and Pilot was not noticed at that time.

Following further dispute over the specifications and plaintiff's performance, the government terminated the contract on October 22, 1975. The plaintiff and the government then entered into termination settlement negotiations. During the settlement negotiations the United States Attorney advised the Corps that a grand jury was investigating the possible bribery of Swenson by the plaintiff, and the Corps suspended negotiations.

Ray and Jaycox subsequently pleaded guilty to violations of 18 U.S.C. § 201(f) (bribery of a public official), and Whitmore to a violation of 18 U.S.C. § 371 (conspiracy), all growing out of their dealings with Swenson regarding the bulkhead contracts. Swenson pleaded guilty to a violation of 18 U.S.C. § 208 (conflict of interest), arising out of his dealings with yet another firm of which he was part owner.

The plaintiff made another request for final payment shortly after Ray and Jaycox were sentenced, which the Corps again denied, and the plaintiff thereafter timely filed this suit.

## II.

A. The conflict-of-interest statute (18 U.S.C. § 208(a)) is violated when

an officer or employee of the executive branch of the United States Government . . . participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a . . . contract, claim, controversy, . . . or other particular matter in which, to his knowledge, he . . . has a financial interest.

The undisputed facts show that Swenson's activities violated this criminal statute. Swenson was an employee of the executive branch. In that capacity he participated "personally and substantially" in various aspects of the letting, administration, and performance of the three contracts here involved. He knowingly had a "financial interest" in those contracts. In its brief the plaintiff "admits that it's [sic] two officers and only stockholders, John C. Ray and Carl Jaycox, entered into an agreement with Allen I. Swenson, . . . whereby they would pay Swenson 25% of the profits realized on all contracts which plaintiff had or would obtain from the Corps of Engineers." No more was required to establish a violation by Swenson of the statute and, indeed, the plaintiff does not deny his violations.

B. The next question is whether Swenson's violations preclude the plaintiff from recovering damages for termination of the barge contract. The decision of the Supreme Court in *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), requires an affirmative answer to that question. (In point III *infra* we discuss the question

whether those violations also permit the government to recover from the plaintiff the amounts it already has paid the plaintiff under all three contracts.)

1. *Mississippi Valley* involved the interpretation and application of the predecessor conflict-of-interest statute, 18 U.S.C. § 434, which differed in substance from the present statute only in that its scope was narrower.[6] The Supreme Court's decision in *Mississippi Valley* and the Court's explication of the policies the conflict-of-interest statute is intended to serve are therefore equally applicable to the present statute.

*Mississippi Valley* grew out of a contract between the Atomic Energy Commission and Mississippi Valley Generating Company ("Generating Company") for the construction of an electric power plant. Eight months after the contract was signed and after the Generating Company had done some preliminary work under the contract, the government terminated it. The Generating Company sued for the amount it had spent in connection with the contract. The government defended on various grounds, but primarily on the ground that the contract was unenforceable because of an illegal conflict of interest involving Adolphe H. Wenzell.

Wenzell had been a vice president and director of First Boston Corporation, a major financial institution. Without severing his relationship with First Boston, Wenzell acted as a part-time uncompensated consultant to the government in its negotiations with the Generating Company, providing advice first on interest costs for any financing undertaken for the project and later on the total cost of the project. He was actively involved on the government's behalf in the negotiations, on occasion serving as the government's sole representative in meetings with Generating Company officers. Among other things, Wenzell, in his capacity as a First Boston officer, wrote a letter to the Generating Company at its request on First Boston stationery in which he furnished his opinion about the probable interest rates for financing the project. Subsequently, in part on the basis of this letter, the sponsors of the project retained First Boston as co-financing agent. Because of its extensive involvement in the financing of major power projects, from the outset it was considered likely that First Boston would participate in the project. Both Wenzell and First Boston were aware that Wenzell's dual position raised serious questions under the conflict-of-interest law.

The Supreme Court held that Wenzell had violated the conflict-of-interest statute and that that violation barred the Generating Company from enforcing the contract. With respect to the former, the Court stated that "[t]he obvious purpose of the statute is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare." 364 U.S. at 548, 81 S.Ct. at 308. It explained that "[t]his broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government." *Id.* at 549, 81 S.Ct. at 309. It also stated that "the statute is more concerned with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation." *Id.* at 550, 81 S.Ct. at 309. The Court ruled that Wenzell violated the statute "by entering into a relationship which made it difficult

---

**6.** Section 434 covered only a person who acted for the government in "the transaction of business" with an entity in which he had any direct or indirect interest. The present statute, however, is not limited to situations involving the transaction of business but more broadly covers conflicts of interest arising from all finan-

cial interests. It also covers (as the predecessor statute apparently did not) dealings in which someone related to the government agent has an interest. S.Rep. No. 2213, 87th Cong., 2d Sess. 13–14, *reprinted in* [1962] U.S. Code Cong. & Admin.News, pp. 3852, 3862.

for him to represent the Government with the singleness of purpose required by the statute." *Id.* at 559, 81 S.Ct. at 314.

The Court relied upon the same policy considerations in holding that Wenzell's violations barred the Generating Company from enforcing the contract, even though the statute did not explicitly provide that remedy (*id.* at 563, 81 S.Ct. at 316):

> As we have indicated, the primary purpose of the statute is to protect the public from the corrupting influences that might be brought to bear upon government agents who are financially interested in the business transactions which they are conducting on behalf of the Government. This protection can be fully accorded only if contracts which are tainted by a conflict of interest on the part of a government agent may be disaffirmed by the Government. If the Government's sole remedy in a case such as that now before us is merely a criminal prosecution against its agent, as the respondent suggests, then the public will be forced to bear the burden of complying with the very sort of contract which the statute sought to prevent. Were we to decree the enforcement of such a contract, we would be affirmatively sanctioning the type of infected bargain which the statute outlaws and we would be depriving the public of the protection which the Congress has conferred.

Because of the importance of maintaining the "integrity of the federal contracting process and . . . protect[ing] the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction," *id.* at 565, 81 S.Ct. at 317, the Court rejected the claim that nonenforcement was a harsh remedy against the Generating Company, which had no control over Wenzell's activities and was not itself involved in any wrongdoing.

2. The present case is an even stronger one than *Mississippi Valley* for denying enforcement of the contract. In *Mississippi Valley* there was no actual corruption shown by either Wenzell or the Generating Company. Neither of them directly profited from the conflict-of-interest position Wenzell occupied; Wenzell did not attempt to use his position with the government to further First Boston's interests. Enforcement of the contract was denied not because Wenzell himself had been corrupt but because he had entered into "a relationship which made it difficult for him to represent the Government with the singleness of purpose required by the statute." *Id.* at 559, 81 S.Ct. at 314.

In the present case, in contrast, there was actual corruption of both the plaintiff and Swenson. The plaintiff's officers agreed to pay and did pay Swenson a percentage of plaintiff's profits on all contracts under Swenson's authority. In return for this payoff, Swenson helped the plaintiff obtain contracts it otherwise might not have received. He also condoned and aided violations of the contract and other improprieties that undoubtedly increased the government's cost or denied the government advantages it could have obtained if its representative had been concerned solely with protecting and promoting the government's interests. The dealings between plaintiff and Swenson constituted the very conduct the statute was designed to reach, "preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare." *Id.* at 548, 81 S.Ct. at 308.

3. The two grounds upon which plaintiff attempts to avoid this result are unconvincing.

a. Plaintiff stresses that Swenson was "never charged nor convicted of a violation of 18 U.S.C. Section 208 relative to any alleged conflict of interest involving this Plaintiff" and "Ray and Jaycox were convicted of a violation of 18 U.S.C. Section 201 [bribery of public officials] relative to the bulkhead 25 and 26 contracts," not the barge contract on which the plaintiff brings this action. Nothing in *Mississippi Valley*, however, indicates or even suggests that a criminal conviction is necessary before enforcement of a contract tainted by a conflict of interest may be denied.

Wenzell was neither criminally charged nor convicted of a violation of the conflict-of-interest statute. Indeed, even an acquittal in a criminal case would not necessarily preclude a finding in a civil case that the acquitted party had engaged in the conduct the criminal statute prohibits. *See, e. g., United States v. Acme Process Equipment Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (United States had right to cancel contract because of payments that violated Anti-Kickback Act, despite acquittal of Anti-Kickback Act violators in criminal prosecution); *Nibali v. United States*, 218 Ct.Cl. ——, 589 F.2d 514 (1978). Enforcement of the contracts in *Mississippi Valley* was denied to further the public policy of the conflict-of-interest statute "to protect the public from the corrupting influences that might be brought to bear upon government agents who are financially interested in the business transactions which they are conducting on behalf of the Government." 364 U.S. at 563, 81 S.Ct. at 316.

b. The plaintiff contends that *Mississippi Valley* does not apply here because the "government has failed to show that the alleged conflict of interest on behalf of Swenson in any way adversely affected the barge contract." It states that it "was the low bidder on the barge contract, it performed the work on the exterior of the barge according to the specifications and only failed to perform the work on the interior of the barge because the government's specifications were defective."

As *Mississippi Valley* makes clear, it is the potential for injuring the public interest created by a conflict of interest that requires invalidation of the tainted contract. It therefore is immaterial whether the particular taint has or has not in fact caused the government any financial loss or damages. What the statute condemns is the inevitable taint of the contract itself that results when it is the product of a conflict of interest. As this court stated in *Michigan Steel Box Co. v. United States*, 49 Ct.Cl. 421, 440 (1914), tainted contracts are disaffirmed because of "the breach of the agent's . . . duty toward those he has undertaken to represent . . . and not

[because of] the quantum of damage to the one or the amount of benefit to the other."

C. Plaintiff contends that regardless of the applicability of *Mississippi Valley*, it is entitled to recover under a theory of *quantum valebat* or *quantum meruit*. It points out that in *Mississippi Valley* the Court denied recovery *quantum valebat* on the ground that the government had received nothing from the Generating Company, and it indicated that "such a remedy is appropriate only where one party to a transaction has received and retained tangible benefits from the other party. See *Crocker v. United States*, 240 U.S. 74, 81–82, 36 S.Ct. 245, 248, 60 L.Ed. 533." 364 U.S. at 566, n.22, 81 S.Ct. at 317. It argues that since the work it did under the barge contract benefitted the government, it is entitled to recover under those theories.

Whatever may be the appropriateness of allowing such recovery where the government has received benefits under the tainted contract, recovery is not permissible where, as here, the firm seeking recovery itself was involved in the corruption of the government official. *See Atlantic Contracting Co. v. United States*, 57 Ct.Cl. 185 (1922). To the contrary, the same reasoning that led the Court in *Mississippi Valley* to invalidate the contract because of a conflict of interest—that to permit recovery under such a contract would be "affirmatively sanctioning the type of infected bargain which the statute outlaws and . . . depriving the public of the protection which Congress has conferred" (364 U.S. at 563, 81 S.Ct. at 316)—also requires rejection of the plaintiff's claim for money under *quantum meruit* or *quantum valebat*.

The courts have rejected similar claims covering the value of goods provided or services rendered under contracts that were unenforceable because tainted. In *Pan American Petroleum & Transport Co. v. United States*, 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734 (1927), the government sought cancellation of contracts and leases that "were obtained and consummated by means of conspiracy, fraud and bribery." *Id.* at

486, 47 S.Ct. at 417. In defense, Pan American claimed that if the contracts were voided, it was entitled to credit for the value of fuel oil and various services it had supplied as consideration under those contracts and leases. The Court disagreed, noting that the "general principles of equity" on which Pan American relied "will not be applied to frustrate the purposes of its laws or to thwart public policy." *Id.* at 506, 47 S.Ct. at 424. The Court stated (*id.* at 509, 47 S.Ct. at 425):

> The petitioners stand as wrongdoers, and no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the government of the improvements made or fuel oil furnished as all were done without authority and as means to circumvent the law and wrongfully to obtain the leases in question.

*See also Rankin v. United States,* 98 Ct.Cl. 357, 367 (1943) ("The plaintiff could not recover on an express contract, so it is equally fatal to the theory of recovery on an implied contract, notwithstanding any benefit which may have accrued to the Government."); *Shasta County v. Moody,* 90 Cal.App. 519, 523–24, 265 P. 1032, 1034 (Dist.Ct.App.1928) ("The contracts in the case at bar . . . *are against the express prohibition of the law, and courts will not . . . permit a recovery upon a quantum meruit or quantum valebat.*") (emphasis in original); *Armco Drainage & Metal Products, Inc. v. County of Pinellas,* 137 So.2d 234 (Fla.Dist.Ct.App.1962) (fact that county ordered and used the goods does not permit recovery where contract for their procurement was void); *McNay v. Town of Lowell,* 41 Ind.App. 627, 84 N.E. 778 (1908) (fact that town had used coal received under an illegal contract and had made no offer to return coal of like quantity and value did not entitle seller of coal to retain its value).

### III.

█ In addition to opposing plaintiff's claim for the balance due under the barge contract, the United States has counterclaimed to recover the amount it already paid plaintiff under that contract and the amounts it previously paid under the bulkhead 25 and 26 contracts. The government is entitled to recover on its counterclaims. The protection of the integrity of the federal procurement process from the fraudulent activities of unscrupulous government contractors and dishonest government agents requires a refund to the government of sums already paid the plaintiff no less than it requires nonenforcement of the contract not yet completed. The policy considerations enunciated in *Mississippi Valley* and discussed above are just as applicable to the former situation as to the latter.

Effective implementation of the conflict-of-interest law requires that once a contractor is shown to have been a participant in a corrupt arrangement, he cannot receive or retain any of the amounts payable thereunder. Permitting the contractor to retain amounts already received would create the danger that "[m]en inclined to such practices, which have been condemned generally by the courts, would risk violation of the statute knowing that, if detected, they would lose none of their original investment, while, if not discovered, they would reap a profit for their perfidy." *Town of Boca Raton v. Raulerson,* 108 Fla. 376, 379, 146 So. 576, 577 (1933).

To deny the government recovery of amounts paid under such tainted contracts would reward those contractors who can conceal their corruption until they have been paid. The policy underlying the conflict-of-interest statute requires that the contractor be required to disgorge the amounts received under the tainted contract no less than it requires denial of recovery under the contract. The anomaly of the contrary result is demonstrated here in the barge contract, where the plaintiff had received part payment when the fraud was discovered. If, as we hold, the plaintiff cannot recover any additional amounts allegedly due under the contract, why should it retain amounts it already has received?

We are dealing here with a situation in which the entire contracting process, from

Whitmore's first solicitation of Swenson to the termination of the barge contract, was fraught with fraud and corruption. The contracts themselves were each infected by this corruption, and each was void *ab initio*. If the government had discovered the illicit arrangement earlier, it could and would have refused to make further payments owing at that time on any of the three contracts. The government's rights to avoid payments on tainted contracts should not depend on the happenstance of the date payment is made. "There should, logically, be no difference in ultimate consequence between the case where a [contractor] has been paid under an illegal contract and the one in which payment has not yet been made." *Gerzof v. Sweeney*, 22 N.Y.2d 297, 305, 292 N.Y.S.2d 640, 644, 239 N.E.2d 521, 523 (1968).

Plaintiff argues, however, that we have held that before the United States may recover amounts paid under an illegal contract, it must show that it suffered a pecuniary loss from the transaction. Neither of the cases it cites so held. In *Crovo v. United States*, 100 Ct.Cl. 368 (1943), the government did not prove the existence of either a fraud or any pecuniary loss. In *Charles v. United States*, 19 Ct.Cl. 316 (1884), on the other hand, the government recovered a payment made upon a fraudulently prepared voucher without any indication that the government had suffered pecuniary loss from the payment.

Moreover, the argument is inconsistent with the basic principles applied in *Mississippi Valley* that once corruption is proven, all financial considerations, such as damage to one party or benefit to the other, are irrelevant to the government's right to disavow the contract. The same principle also requires refund of amounts paid under the tainted contracts, and the question whether the government suffered pecuniary loss from the contracts similarly is irrelevant.

Apparently there are no federal decisions dealing with the right of the United States to recover money paid under a contract that subsequently is determined to have been illegal. Several state courts, however, have permitted state and local governments to recover. *See, e. g., S. T. Grand, Inc. v. City of New York*, 32 N.Y.2d 300, 344 N.Y.S.2d 938, 298 N.E.2d 105 (1973); *Shasta County, supra; Town of Boca Raton v. Raulerson, supra; Armco Drainage, supra; McNay, supra; Beakley v. City of Bremerton*, 5 Wash.2d 670, 105 P.2d 40 (1940). We apply the same salutary principles to the federal conflict-of-interest law, and hold that a contractor who has participated in an illegal conflict-of-interest situation is not entitled to retain the amounts received under the tainted contract.

### CONCLUSION

The government's motion for summary judgment is granted. The plaintiff is not entitled to recover on its petition. The government is entitled to recover on its counterclaims for the amounts it previously paid under the bulkhead 25 and bulkhead 26 and the barge contracts. The case is remanded to the Trial Division to determine the amount of recovery pursuant to Rule 131(c).