**AMERICAN BANK OF SAN ANTONIO**

v.

**The UNITED STATES.**

No. 569–77.

United States Court of Claims.

July 16, 1980.

Walter C. Wolff, Jr., San Antonio, Tex., Atty. of Record, for plaintiff; Wolff & Wolff, San Antonio, Tex., of counsel.

Frank M. Rapoport, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

This case is before the court on the parties' cross–motions for summary judgment. The plaintiff participates as a lender in the Federal Insured Student Loan Program and seeks recovery of the unpaid balances of certain student loans it issued under that program. The government denies liability, asserting that the plaintiff has not met the requirements for indemnification with respect to these loans. In addition, the government counterclaims for the interest benefits and special allowances already paid the plaintiff on the loans. We hold that the plaintiff's failure to satisfy the require-

ments for coverage under the program absolved the government from liability on all the loans in issue. We therefore deny the plaintiff's motion for summary judgment and grant the government's motion entirely on the plaintiff's claims and partially on its counterclaims.

## I.

A. The Federal Insured Student Loan Program is one of the means by which the government assists students in meeting the costs of attending postsecondary schools. Under this program, private financial institutions make education loans to students, and the government then insures the loans against default by the students. The government also pays a portion of the interest on these loans. 20 U.S.C. § 1071(a) (1976). From its inception until the time of this suit, the program was administered by the Office of Education of the Department of Health, Education, and Welfare.

A lending institution that wishes to participate in the program enters into a contract of insurance with the Commissioner of Education. A student seeking a federally insured loan initiates the process of obtaining it by completing a portion of an application form, the remainder of which is then filled out by the student's school and the lender. The lender sends the completed application form to the Office of Education for its approval and an insurance commitment, upon receipt of which the lender is authorized to make the insured loan. At the same time, the student and the lender execute a promissory note, which provides for assignment to the government in the event of default. If the student defaults, the lender submits a claim for payment to the government, accompanied by the promissory note, assigned to the government, and all other essential supporting documents.

B. This case arises out of loans the plaintiff made to approximately 90 students,[1] all of whom have defaulted in whole or in part in repaying the loans. When the plaintiff made these loans (mostly in 1973 and 1974), it filed applications under the federal insurance program with the Office of Education, which approved all the loans. After the defaults, however, the government denied each of the plaintiff's claims for recovery, assigning one or more of six types of procedural error or omission by the plaintiff as the reason for each denial.[2] The plaintiff then filed this suit for recovery of the amounts the students are in default.[3]

## II.

In evaluating the validity of each of the six reasons on which the government relies to justify denial of the plaintiff's claims for payment, we start from the premise that the government is entitled to set reasonable terms and conditions for par-

---

1. The plaintiff's petition sought relief with respect to 89 loans. Apparently because some students have repaid their loans and the government has refused to pay other claims since the filing of the petition on November 30, 1977, the number of loans actually at issue has fluctuated. The briefs of both parties discuss 90 specific loans, although the government states that "[t]his is an action ... to recover the unpaid proceeds of loans made to ninety–one students."

2. The government's six justifications for denial of the plaintiff's claims are:
    (A) The promissory note and/or application forms were altered.
    (B) The promissory note failed to name the lender.
    (C) The plaintiff lost the promissory note and application.

    (D) The plaintiff failed to exercise due diligence in collecting the loan.
    (E) The plaintiff failed to enclose crucial documentation with its claims submission.
    (F) The plaintiff disbursed the proceeds of the loans before it had received an insurance commitment.
    We will explain each of these reasons in further detail as each is taken up in the opinion.

3. A federal grand jury in Texas began an investigation of the administration of the Federal Insured Student Loan Program there in March 1975. The government's motion for a stay of this case pending completion of that investigation was denied by Trial Judge Spector on May 4, 1978.

ticipation in the loan guaranty program and may refuse to insure loans with respect to which the requirements have not been satisfied. Congress has delegated to the Commissioner of Education the authority (20 U.S.C. § 1082(a) (1976)) to

(1) prescribe such regulations as may be necessary to carry out the purposes of this part;

.    .    .    .    .

(3) include in any contract for Federal loan insurance such terms, conditions, and covenants relating to repayment of principal and payment of interest, relating to his obligations and rights and to those of eligible lenders, and borrowers in case of default, and relating to such other matters as the Commissioner determines to be necessary to assure that the purposes of this part will be achieved . . . .

Pursuant to this authority, the Commissioner promulgated regulations specifying the procedures to be followed by participants in the program and their rights and responsibilities. 45 C.F.R. pt. 177 (1978) (in particular, sections 177.41–.78).[4] In addition, the Office of Education supplies each participating lender with a Manual for Lenders (issued May 31, 1972),[5] which provides detailed supplementation of the regulations and gives instructions and examples regarding the steps involved in making loans, obtaining insurance, and seeking reimbursement. (The Manual also includes complete copies of the applicable statutes and regulations.)

The plaintiff does not challenge the regulatory provisions at issue. Indeed, in most instances, the plaintiff does not dispute the government's contention that the plaintiff's procedures violated these regulations. Instead, the plaintiff generally argues, as developed *infra*, that its violations of the regulations were at most minor, technical ones that we should excuse and not allow as a barrier to its otherwise rightful insurance recovery.

Although the regulations and other rules on which the government bases denial are often intricate, such rules are an essential aspect of the proper operation of a complex and widespread insurance program. They are especially important where, as here, the government, as insurer, has a large financial stake in the sound operation of the participating lenders. We cannot conclude that, in fulfillment of his responsibility to provide careful federal supervision over the loan insurance program, the Commissioner was not entitled to establish these rules or to make compliance with them a condition of loan insurance. The reasonableness of requiring such compliance is confirmed by the fact that the plaintiff is a bank and therefore accustomed to dealing on a daily basis with state and federal banking and other regulations at least as involved as those governing the federal student loan insurance program.

It is in the light of these considerations that we discuss the six grounds upon which the government refused to reimburse the plaintiff.

III.

■ A. *Altered promissory notes.* With respect to 39 claims still pending, the promissory notes and application forms originally were prepared with the National Bank of Fort Sam Houston rather than the plaintiff as lender. Subsequently, the name of the Fort Sam Houston Bank was "whited out" where it appeared on these documents, and the plaintiff's name was typed in its place. The plaintiff submitted the application forms for governmental approval in this condition, and then, after these students defaulted, attached the altered promissory notes to its claim for payment from the government. The government ruled, however, that these altered notes did not satisfy

---

4. The regulations governing the student loan programs were completely redrafted in 1979. 44 Fed.Reg. 53868 (1979) (as pertaining to Federal Insured Student Loan Program, codified in 45 C.F.R. §§ 177.500–.713 (1979)).

5. The Office of Education issued a revised Manual for Lenders on December 20, 1976. Unless otherwise noted, the relevant facts in this case occurred before that date, and we therefore use the earlier Manual.

its requirement that promissory notes assigned to the government by the lender accompany all claims for payment (20 U.S.C. § 1080(b) (1976); 45 C.F.R. § 177.-48(a)(4), (d) (1978); Manual for Lenders para. IV.B.1.c (1972)), and on this basis denied the claims.[6]

Although no regulation or Manual provision directly forbids the use of an altered promissory note to satisfy this requirement, the prohibition is justified by the government's statutory entitlement to be "subrogated for all the rights of the holder of the obligation upon the insured loan." 20 U.S.C. § 1080(b) (1976). The government's right of subrogation contemplates that the bank's assigned claim against the student will be valid to the extent that it is enforceable on it face. That requirement is implicit in the condition that payment of the bank's claim is "contingent upon receipt of an assignment to the United States of America of all right, title and interest of the lender of the note on which the claim is filed." 45 C.F.R. § 177.48(d) (1978).[7] Unless the bank's claim against the student is enforceable at the time of assignment, the subrogation rights the government receives in exchange for the insurance payments would be worthless.[8]

One of the basic responsibilities placed on lenders is to use reasonable care in conducting their part of the program. *See* 45 C.F.R. § 177.48(b) (1978); Manual for Lenders para. II.C.2 (1972). A major reason for this requirement is to protect the financial integrity of the program by minimizing the potential governmental liability under it. Lender practices that diminish the enforceability of the promissory notes increase the government's losses as insurer by limiting its ability to collect from the defaulting students.

■ The plaintiff concedes that its use of altered promissory notes and application forms is an "undoubtedly sloppy" practice. It therefore does not satisfy the general reasonable care standard. Furthermore, by providing the government with such promissory notes, on which the government may wish to seek recovery from the students, the plaintiff has not assigned the government a claim that is indisputably enforceable. A material alteration in a commercial instrument such as a promissory note by one of the parties to the instrument after its execution and without the consent of one of the other parties renders the instrument unenforceable against the nonconsenting party. *See* 3A C.J.S. *Alteration of Instruments* § 6 (1973).

If the alterations in these notes do not fall within this general rule, it was the plaintiff's obligation so to demonstrate when it submitted its claim to the Office of Education.[9] The burden is on the plaintiff

---

**6.** One of the government's major contentions regarding these loans is that the loans were uninsured because they had been transferred from the Fort Sam Houston Bank to the plaintiff, without complying with regulations governing assignment of loans. 45 C.F.R. § 177.49 (1975). Exactly what transpired between the students' requests for loans and the plaintiff's submissions of the applications is, however, unclear, and we are not sure that the replacement of the Fort Sam Houston Bank as payee by the plaintiff constituted an assignment. But, as discussed in the text, even if the plaintiff was not required to submit the loan transfer forms, the government was justified in not paying these claims.

**7.** The plaintiff filed a post–argument submission containing copies of promissory notes executed by some of the students just before their first payments were due and without any alterations. Apart from questions relating to the timeliness of their submission or the validity of these notes, these notes cannot support the plaintiff's claims, since the notes have never been assigned to the government (only 5 of the 14 notes had the assignment stamp placed on them, and these stamps were not filled in).

**8.** *United States v. Dold*, 462 F.Supp. 801 (D.S. D.1978), provides an example of the United States' use of subrogation against defaulting student borrowers.

**9.** The government requires the lender to attach all essential supporting documents to its claim for payment. 45 C.F.R. § 177.48 (1978). Because of the statutes of limitations on the claims against the students and factors such as the increased difficulty over time of tracking down the defaulting students, the government should not have to consider any materials not submitted when the claims are made or, possibly, shortly thereafter.

to show that the alterations made on these notes do not affect their enforceability; indeed, it must show that, in a suit against the students on these notes, the government could successfully defend any claim by the students that the alterations rendered otherwise valid notes invalid. The plaintiff has not made that showing. The government is not required to condone the defects in the notes the plaintiff submitted to it on the basis of the plaintiff's suggestion that even if the notes are invalid the government might recover anyway on a theory of unjust enrichment. The relative uncertainty of any implied contract claim does not satisfy the government's legitimate request for a fully enforceable contract on which to attempt to recoup its losses.

The plaintiff contends that the government may not object to the alterations because the government approved the altered copies of the application forms. The alteration in the notes, however, is, the fact that threatens the ability of the government to recoup its payments, and those notes were not submitted to the government when it issued the insurance commitments in response to the applications. Just because the name of the payee was changed on the application form, which the plaintiff was required to submit to get the federal insurance commitment, Manual for Lenders para. III.C.1 (1972), would not necessarily mean that the name of the payee was changed on the promissory note, which was not supposed to be supplied to the government until the lender made a claim for payment, id.

**B.** *Promissory note failed to name the lender.* In one instance, the promissory note attached to plaintiff's claim did not name a lender. A promissory note with such a deficiency is not enforceable, and for the reasons stated in section III.A, *supra*, the government therefore justifiably refused to pay this claim. The plaintiff's case here is especially weak since the government concedes that the plaintiff probably

could have filled in its own name, at least until it made the claim for payment, which gave the plaintiff ample opportunity to rectify its mistake. The plaintiff's offer to cure its error now is untimely. *See* note 9, *supra.* The plaintiff's argument that the government could proceed against the students anyway on an implied contract theory is no more persuasive here than it was with respect to the altered promissory notes.

**C.** *Lost promissory note and application.* With respect to another loan, the plaintiff did not submit the student's application form or the promissory note when it filed its claim with the government. Lenders are required to submit both items when making claims, *see* Manual for Lenders para. IV.B.1.b, c (1972), and both items are essential to the government's evaluation of claims and ability to seek recovery from the defaulting students.

The plaintiff's justification for this breach of its obligations is that it lost the originals of these forms. Its attempt to correct its mistake by attaching copies of the missing forms to its opening brief in this case is unavailing. The government specifically requires the original of these forms, not copies. *Id.* Losing the forms is thus a violation of the plaintiff's responsibility to use "*reasonable care ... in the making and collecting of loans.*" *Id.* para. II.C.2 (emphasis in original). It is difficult for us to believe that a bank would be so careless as to lose crucial documentation for its commercial loans. Even if these copies would be sufficient,[10] this submission of these documents comes too late, and in addition, the plaintiff has failed to assign the promissory note to the government. *See* page 547, *supra.* And again we reject the plaintiff's recurring argument based on the possible availability of an implied contract claim. *See* page 548, *supra.*

**D.** *Failure to exercise due diligence in collecting loans.* The government denied these five claims on the basis of the plain-

---

**10.** We note that the copy of the application form attached to the plaintiff's brief is virtually illegible, while the copies attached to its brief of applications for which the plaintiff has the original are clear and easily read.

tiff's failure to exercise reasonable care and due diligence in the collection of the loans, as required by the statute, regulations, and Manual. *See* 20 U.S.C. § 1080(d) (1976); 45 C.F.R. § 177.48(b) (1978); Manual for Lenders para. II.C.2 (1972). The specific violation on which the government relies is the "plaintiff's failure to file a claim within a reasonable time after it was determined that the loan could not be collected." [11]

Lenders must meet four specific conditions in order to receive insurance payments on defaulted loans. The third of these, which is the one at issue here, requires lenders to make "a written demand for payment . . . not less than 30 days nor more than 60 days prior to the filing of the claim for loss." 45 C.F.R. § 177.48(a)(3) (1978). *See also* Manual for Lenders para. IV.B.4.b (1972). This requirement fulfills part of the lenders' general obligation to "utilize collection practices no less extensive and forceful than those generally in force among financial institutions." 45 C.F.R. § 177.48(b) (1978).

The obligation of prompt pursuit of payment by lenders ensures that lenders do not take advantage of the availability of loan insurance and leave to the government the collection efforts they normally would make. The requirement that the claim be submitted between 30 and 60 days following final written demand for payment serves two purposes. First, it ensures that the students are given a reasonable opportunity to respond to the demand for payment before the government considers proceeding against them. Second, if the student nevertheless remains in default, the government has a reasonably fresh claim on which to pursue its right of subrogation. (*See* note 9, *supra*.)

The plaintiff does not directly dispute the government's allegation that it did not file its claim within 60 days after sending final demand letters to the defaulting students. Instead, the plaintiff argues that it generally followed appropriate collection proce-

dures and therefore "that as a matter of law plaintiff has exercised due diligence in the collection of the disputed loans." It also contends that there is no requirement "that a claim must be filed within a reasonable time after it was determined that the loan could not be collected," which is how the government describes the plaintiff's breach, but only a requirement that the claim follow the final demand letter by no more than 60 days. The plaintiff then argues that there is no need to send any demand letters after the student–debtor has skipped (which appears to have happened with respect to at least some of the students here involved), and alternatively, that if such a need exists, the plaintiff should be provided the opportunity to do so now, and then to refile its claim 30 days later.

Although the parties' arguments leave us somewhat uncertain whether the problem here is that the plaintiff waited too long after sending a written demand for payment to file its claim with the government, as the government's argument implies, or whether it is that the plaintiff gave up collection efforts when these students skipped and thus never sent a written demand, as the plaintiff's argument implies, we conclude that in either case the plaintiff has not satisfied the government's requirements set out in section 177.48(a)(3) of the regulations.

Under the first view of the events surrounding these loans, the plaintiff clearly neglected to file its claims timely, since it waited from 3 to 11 months after sending what the government considers the demand letter, instead of filing the claim within the 2–month period mandated by the regulations. On the other hand, the plaintiff's theory that it does not have to pursue vigorously students who have skipped or otherwise seem to be unavailable finds no support in the statute, regulations, or Manual. In fact, the regulation specifies that a demand letter must be sent in all cases of

11. The letters of rejection for these claims referred to other violations of the due diligence regulations, but we agree with the government that we "need not reach those issues to sustain [the government's] position."

default, without suggesting any exceptions. It is not for participating lenders such as the plaintiff to decide whether it is necessary to comply with such specific rules.

The plaintiff's complaint that the government is attempting to enforce an unauthorized standard against it by requiring submission of claims within a reasonable time after loans appear uncollectible ignores the regulatory standard on which the government actually relies.

Once again, the plaintiff's offer to correct mistakes made more than 4 years ago, and which would prejudice the government even if now permitted, see note 9, supra, must be rejected as untimely.

■ E. *Failure to enclose documentation with claims.* In 20 instances, the plaintiff disbursed funds to students after the students withdrew from school. Ordinarily, such disbursements are impermissible, as the student loan program is designed to provide funds only for current educational purposes. *See* 45 C.F.R. § 177.46(c)(1) (1978); Manual for Lenders paras. III.D.1, D.9 (1972).

The plaintiff alleges, however, that these disbursements were for the earned portion of each student's tuition, which covered only the period of time when the student was actually enrolled in school although paid after the student left. The plaintiff further claims that it applied for and received permission to do this from the Office of Education as provided for in the Manual for Lenders para. III.D.1 (1972): "Requests for exception to this rule must be made in writing to the Office of Education Regional Office explaining the unusual circumstances which resulted in the request."

Assuming *arguendo* that the plaintiff did receive such permission, however, the plaintiff still is not entitled to recover on these loans. One of the basic conditions for payment from the government is the support of the claim by "such documents as are required by the Commissioner." 45 C.F.R. § 177.48(a)(4) (1978). The regulations specifically require lenders to submit claims "together with the original or copies of all

documents relating to the approval and servicing of the loan." *Id.* § 177.48(c). Since amounts paid to students while they are not in school are generally not insured, any documentation authorizing such disbursements would be material and should have been submitted with the claim. The government may act on the basis of the information before it. When the government denied the claims with respect to post-withdrawal disbursements, there was nothing before it that indicated that those disbursements; had been authorized. The plaintiff's submission of supporting material with its motion for summary judgment comes too late to cure its defect.

■ F. *Disbursement prior to loan insurance commitment.* There are 24 cases in which the government denied the plaintiff's claims on the basis of the plaintiff's disbursement of loan funds before receiving approval of the loans from the Office of Education. The government relies on 45 C.F.R. § 177.42(b) (1978) to support its denial of these claims:

[I]f the loan is determined to be insurable, the Commissioner shall, by affixing to the application evidence thereof, advise the lender that the loan is insurable and the amount of insurance. The insurance shall extend to all disbursements made pursuant to the loan except that, unless expressly provided for, no disbursements made on a loan prior to the issuance of the insurance shall be covered.

The plaintiff does not deny that it disbursed funds in 20 of these cases before receiving the evidence of insurance that the regulation requires. It claims, however, that its disbursements were conditionally insured by an authorized local official of the Office of Education, and that the subsequent approval by the Office itself ratified the conditional insurance. In the other four cases, the plaintiff asserts that it did not disburse any funds before receiving governmental approval and that denial of its claims for this reason was therefore improper. The government responds that there are alternative grounds for denial of these four claims so that even if the Office of Educa-

tion was mistaken (which the government does not concede), the plaintiff is not entitled to recover. We reject the plaintiff's arguments with respect to both sets of claims denied because of early disbursement.

1. The procedure that lenders are required to follow to satisfy the above-quoted regulation is clearly stated in the Manual. After an application form and promissory note are executed by the student, school, and lender, to the extent each is responsible, "[t]he lender forwards the lender's copy (white) and OE copy (yellow) of the student application (with carbon intact) to the appropriate Office of Education Regional Office shown in appendix D [to the Manual]. The lender's file copy (green) and the two copies of the Promissory Note are retained by the lender." Manual for Lenders para. III.C.1 (1972).

When the loans at issue were made, the processing of all applications was performed in Kansas City where the central computer was located. Only after receiving official approval from the Kansas City office could the lender disburse loan funds: "The lender must receive the lender's copy [white] of the student application with an Office of Education insurance commitment in the upper right corner before disbursing any funds." *Id.* para. III.D.1. The instructions to lenders printed on the back of all three copies of the application state the same principle: "The disbursement of funds must not be made until the original copy of the application is returned with the insurance commitment indicated in the upper right hand corner." The government requires this procedure to allow it to determine the student's prior status in the program and other factors affecting the student's qualifications for participation in the program and therefore ensure that insured loans are not made to unworthy students.

The plaintiff did not follow this procedure in handling the 20 loans regarding which the facts are not in dispute. Instead, apparently because the schools needed funds without delay, the plaintiff sought permission from Leo Hatten, a regional of-

ficial of the Office of Education, to disburse the funds before receiving an insurance commitment from Kansas City. Mr. Hatten authorized the early disbursements, and signed the lender's file copy (green) to so indicate. The plaintiff then disbursed the funds and subsequently received the approval and insurance commitment from the Kansas City office marked on the white copy. (The gap between disbursement and commitment was generally 1 or 2 weeks, but in at least one instance it was more than 2 months.)

The plaintiff argues that this deviation from the required procedures was permissible because of Mr. Hatten's approval of the early disbursement. The plaintiff contends that Mr. Hatten had authority ("apparent," if not "actual") to approve the issuance of loan funds before an official insurance commitment was made. Under this theory, his indication of such approval constituted at least a conditional commitment to insure the loans, validated by the later official commitment. The plaintiff's president during this period stated in an affidavit that he understood from his discussions with Mr. Hatten that the plaintiff

> could fund the loan based on the green copy ... signed by him, ... and that ... would be all right unless the white copy was turned down in Kansas City, in which case plaintiff would be funding an uninsured loan; but if the white copy were approved and stamped in Kansas City, that the funding on the green copy ... would be all right.

The regulations and Manual sections quoted above, however, are clear and unambiguous that lenders may not disburse funds before receiving the white copy of the application with the appropriate indications of governmental insurance commitment. Indeed, the green copy itself states that lenders must wait to disburse funds until the original (white) copy of the application is returned with an insurance commitment. In these circumstances, the plaintiff was not justified in disbursing the loans on the basis of Mr. Hatten's authorization made on the green copy.

Any delegation of authority to Mr. Hatten to issue loan insurance commitments (and the government denies that such existed) would have required an explicit statement that he was authorized to do so. The Commissioner did not authorize, expressly or otherwise, the plaintiff to disburse funds before receiving the official commitment. Furthermore, the only other official of the Office of Education who was authorized to waive any requirement for loan insurance did not do so. According to the affidavit of Edward T. York, Jr., Special Assistant to the Commissioner of Education and the only one other than the Commissioner himself with authority to change the procedures for insuring loans, "[t]he regional office never had the authority to give a 'conditional commitment' to a lender by fixing the insurance stamp to the green lender's copy of the student application form." [12] Without a waiver of the regulation's requirement by the Commissioner or his authorized delegate, the plaintiff's loans issued before the central office made its commitment are not covered by the government's insurance.

The only other judicial decision on the question of the legitimacy of disbursements on the basis of local, not central, insurance commitment supports our conclusion. The court in *Hicks v. Harris*, 606 F.2d 65, 68 (5th Cir. 1979), held that government employees below the associate commissioner level (such as Mr. Hatten) purporting "to waive the requirements for obtaining federal student loan insurance . . . were acting outside the bounds of their authority and could not bind the government to repay the defaulted loans."

2. In three of the cases in which the plaintiff asserts that the disbursement date was after the insurance commitment date, the plaintiff was given an opportunity to resubmit the claim to the Office of Education and should have, but did not, submit at that time documentation proving its position. (The checks to the students would have sufficed.[13]) Thus, even if the government's initial assessment of the three loans is not correct (if it is correct, of course, the analysis in the first part of this section applies here as well), the plaintiff failed to provide required documentation, and the discussion in section III.E, *supra*, applies instead to bar recovery.

In the fourth case, the plaintiff asserts that the disbursement and commitment dates were the same (March 20, 1974). The disbursement check, however, is dated March 19, the day before the insurance commitment was made. In any event, it would be virtually impossible for the plaintiff, located in San Antonio, Texas, to have received the insurance commitment on the same day it was mailed in Kansas City. Although the plaintiff suggests that the commitment may have been rendered by the Kansas City office over the telephone, it presents no evidence that it had knowledge of the insurance commitment other than by the return of the stamped white copy of the application form.[14]

---

12. Mr. York explained that there was a limited delegation of authority to the local offices, granted after loan commitments were all centralized in the early 1970's, to issue loan commitments where the insurance had initially been denied by the central office because of some technical violation, which was subsequently corrected. He stated that the regional offices had no other authority to commit the government to insure student loans.

13. The plaintiff asserts that no check exists in these cases because it deposited the funds directly to the account of the school. Even if so, however, the plaintiff kept internal records of these transactions, copies of which it submitted to the court, which would have been equally acceptable at the time in support of its claims.

14. Both parties agree in their briefs that the commitment date was March 20. In a computer printout submitted by the government in support of its counterclaims (*see* part IV, *infra*), however, the commitment date is listed as March 14. If this is correct, and both parties are wrong, the loan would have been insured, but the plaintiff still would not be entitled to recover. As with the other three loans denied for early disbursement that may have been timely disbursed, the plaintiff failed to provide the government with documentary proof of the validity of its claim (here, proof of disbursement on the 19th–the check–and proof of commitment on the 14th–a copy of the stamped commitment on the application form) in response to the government's denial of the claim because of early disbursement.

## IV.

■ The government in its counterclaims seeks a refund of all payments it made to the plaintiff on the loans here held uninsured because of the plaintiff's violation of prescribed procedures. The government asserts that the payments on these loans were made erroneously on the assumption, later proved incorrect, that the loans were insured, and that not only its obligation to reimburse loans in default but also to make special payments to lenders while loans are outstanding extends only to validly insured loans.

The government makes two types of payments to lenders with respect to validly insured student loans. The government pays interest benefits to each lender commencing when the lender disburses funds to the student. These payments continue until the end of the grace period (not to exceed 12 months) following the cessation of the student's enrollment in school on at least a half–time basis or until the student defaults on the obligation to repay the loan. 20 U.S.C. § 1078 (1976); 45 C.F.R. § 177.4(a) (1978).

In addition, pursuant to the Emergency Insured Student Loan Act of 1969, 20 U.S.C. § 1078a (1970) (repealed 1976), and 20 U.S.C. § 1087–1 (1976) (which replaced the earlier scheme), special allowances are paid on loans if "then current economic conditions ... are impeding or threatening to impede the carrying out of the purposes of this part, and have caused the return to holders of such loans to be less than equitable." 20 U.S.C. § 1078a(a)(1) (1970); *see* 20 U.S.C. § 1087–1(a) (1976). *See also* 45 C.F.R. § 177.4(c) (1978).

We agree with the government that the plaintiff's failure to follow the prescribed regulations and procedures has eliminated *any obligation by the government to make* payments to the plaintiff. There is no valid distinction between the insurance payments the government makes after default and the interest and other payments it makes while the loans are outstanding that would justify treating them differently. *See* Manual for Lenders para. VI.A.1 (1972) ("In

order to qualify for payment of Federal interest benefits, a loan, when disbursed, ... (a) ... must be federally insured ....") *and id.* para. VI.B.2 ("The special allowance is paid on all loans made or insured under the program which are disbursed on or after August 1, 1969."). Similar provisions appear in Manual for Lenders paras. VI.2.1 and VI.3.3 (1976).

Furthermore, there is no legitimate reason why the situation should differ depending on when the government discovers there was, in fact, no valid governmental insurance on the loans. In this case, the government did not and probably could not discover the plaintiff's breaches that voided the insurance and justified nonpayment of then pending insurance claims until after the interest and special allowance payments had all been made. This happenstantial distinction, when not the government's fault, should not affect the eventual result. The government was not required to make any further payments on loans not insured and should be able to recover those payments mistakenly already made. *Cf. K & R Engineering Co. v. United States*, 222 Ct.Cl. ——, ——, 616 F.2d 469, 476–77 (1980). Similarly, the court in another case arising under the Federal Insured Student Loan Program, *Knoxville Business College v. Boyer*, 451 F.Supp. 58, 62 (E.D.Tenn.1978), granted the government's counterclaim, which sought a declaratory judgment that the government had erroneously made interest and special allowance payments on loans that were improperly insured and that the government could therefore recoup such payments.

The government, however, is not entitled to recover the interest and other benefits paid on all 90 of the loans in dispute. In several cases, the claims for insurance were denied not because the loan had not been insured from the time of the initial disbursement but because the plaintiff failed to submit a proper claim for reimbursement. Since the payments the government seeks to recover are paid throughout the period the loans are outstanding (and at least in the case of interest benefits, termi-

nate at the student's default), any mistakes the plaintiff may have made at the time it filed its claims cannot affect the government's obligation to have made these payments.

Thus, in any instance in which the plaintiff can show that but for an error made after the student defaulted on the loans it would have been entitled to recover on its claims, the government may not recover on its counterclaims. For this purpose, and also to calculate the recovery for the government where appropriate, this case will have to be remanded to the Trial Division. The plaintiff is not there precluded from introducing in defense against the counterclaims evidence that we have declined to consider as untimely in determining plaintiff's claim.[15]

### CONCLUSION

The plaintiff's motion for summary judgment on its petition is denied, and the government's motion for summary judgment on the petition is granted. The government's motion for summary judgment on its counterclaim is granted in part and denied in part, and the case is remanded to the Trial Division pursuant to Rule 131(c) for further proceedings consistent with this opinion.

15. The government's initial calculation of its recovery includes benefits paid on all loans issued to those students whose defaults led to this suit. This is improper, since this includes loans that the students repaid and are, therefore, not at issue in this suit. (The government appears, however, to have corrected this error in a later calculation.)